**CASE NO. 25-2068**

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

MICHAEL BRIGGS,

     Plaintiff-Appellant,

v.

THE UNIVERSITY OF NEW MEXICO, a public university, THE BOARD OF
REGENTS OF THE UNIVERSITY OF NEW MEXICO, GARNETT STOKES,
individually and in her official capacity, PAUL B. ROTH, individually and in his
official capacity, DOROTHY ANDERSON, individually and in her official
capacity, LAURA VELE BUCHS, individually and in her official capacity, and
KEVIN GICK, individually and in his official capacity,

     Defendants-Appellees.

---

On Appeal from the United States District Court
For the District of New Mexico
The Honorable Kea W. Riggs
District Court Case No. 20-cv-00651 KWR-JMR

---

**APPELLANT'S OPENING BRIEF**

---

Travis G. Jackson
Sarah K. Downey
Jackson Loman Downey & Stevens-Block, P.C.
201 3rd St. NW, Suite 1500
Albuquerque, New Mexico 87102
(505) 767-0577
travis@jacksonlomanlaw.com
sarah@jacksonlomanlaw.com
Attorneys for Plaintiff-Appellant Michael Briggs

ORAL ARGUMENT IS REQUESTED

## RULE 26.1 DISCLOSURE STATEMENT

Plaintiff-Appellant Michael S. Briggs is an individual to whom Rule 26.1 of the Federal Rules of Appellate Procedure and Tenth Circuit Rule 26.1 do not apply.

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT..................................................... i

TABLE OF CONTENTS............................................................................ ii

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF RELATED CASES ........................................................1

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES.................................................................2

STATEMENT OF THE CASE.....................................................................4

    I.     Statement of Relevant Facts.........................................................4

         A.    Plaintiff Was an Exemplary UNM Employee.....................4

         B.    UNM Faced Public and Government Pressure to Aggressively
Investigate and Discipline Sexual Assault ...........................5

         C.    Statistical Evidence of Gender Bias by UNM .....................8

         D.    The False Report of Sexual Assault Against Plaintiff ......................11

         E.    Biased and Irregular Investigation by UNM......................19

         F.    Ex Parte Appeal and Reversal by UNM President.............................24

         G.    UNM's Irregular and Biased Imposition of Discipline......................26

    II.    Statement of Relevant Procedural History...................................29

    III.    Rulings Presented for Review ....................................................31

SUMMARY OF THE ARGUMENT .........................................................31

ARGUMENT ...........................................................................................33

    I.     Standard of Review ...................................................................33

         A.    Summary Judgment...........................................................33

         B.    Rule 12(b)(6) Dismissal for Failure to State a Claim .........34

         C.    District Court Decision to Exclude or Strike Evidence on Summary
Judgment .........................................................................35

II.     The District Court Erred by Granting Summary Judgment to UNM on Briggs' Title IX Claim ...............................................................35

    A.      The Record Contains Sufficient Evidence to Create a Genuine Dispute of Material Fact as to Gender Bias......................................................39

    B.      The District Court Erred by Striking Dr. Larson Declaration ...........49

III.    The District Court Erred by Granting Summary Judgment Against Plaintiff's Title VII, NMHRA and Related Claims ................................54

IV.     The District Court Erred by Dismissing Plaintiff's Breach of Implied Contract Claim (Count VI) ......................................................................54

CONCLUSION ...................................................................................................57

STATEMENT REGARDING ORAL ARGUMENT ...........................................57

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS ..........59

CERTIFICATE OF SERVICE ...........................................................................60


ATTACHMENT 1: District Court Order Filed May 23, 2025 [Doc 172]

ATTACHMENT 2: District Court Order Filed September 22, 2021 [Doc 39]

ATTACHMENT 3: Judgment Entered by District Court on May 23, 2025 [Doc. 173]

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................... 28, 34

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................35

*Barber v. Gen. Elec. Co.*, 648 F.2d 1272 (10th Cir. 1981)......................................34

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....................................................35

*Bird v. W. Valley City*, 832 F.3d 1188 (10th Cir. 2016) ...........................................32

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979) ..................................................36

*Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205 (10th Cir. 2022 ....................................35

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) ...................................................... 40, 41

*Doe v. Coastal Carolina Univ.*, 522 F. Supp. 3d 173 (D.S.C. 2021) .......................41

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016)................................................47

*Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545 (3d Cir. 2017)..............................36

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019)......................................... 38, 40

*Doe v. Regents of Univ. of California*, 23 F.4th 930 (9th Cir. 2022) ......................49

*Doe v. Rollins Coll.*, 77 F.4th 1340 (11th Cir. 2023) ........................................ 37, 39

*Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858 (8th Cir. 2020)...................40

*Doe v. Univ. of Denver* ("*Doe I*"), 952 F.3d 1182 (10th Cir. 2020) ...................5, 35

*Doe v. Univ. of Denver ("Doe II")*, 1 F.4th 822 (10th Cir. 2021) 8, 9, 10, 32, 34, 36, 37, 38, 39, 41, 42, 43, 50

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ..............................................53

*Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶ 14, 121 N.M. 728, 732, 918 P.2d 7, 11 ........................................ 3, 33, 54, 55, 56, 57

*Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1175 (10th Cir. 2001) ...............................................................................34

*Hansen v. SkyWest Airlines*, 844 F.3d 914 (10th Cir. 2016) ...................................48

*Hiatt v. Colorado Seminary*, 858 F.3d 1307 (10th Cir. 2017)..................................36

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) .....................................36

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir. 2000) ..............37

*King v. Est. of Gilbreath*, 215 F. Supp. 3d 1149 (D.N.M. 2016) ..................... 33, 52

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)........................ 36, 37, 39

*Mirzai v. State of New Mexico Gen. Servs. Dep't*, 506 F. Supp. 2d 767 (D.N.M. 2007). ....................................................................................................49

*Morgan v. Hilti, Inc.*, 108 F.3d 1319 (10th Cir. 1997) ............................................38

*Newberry v. Allied Stores, Inc.*, 1989-NMSC-024, 108 N.M. 424, 773 P.2d 1231 .54

*North Haven Board of Education v. Bell*, 456 U.S. 512 (1982) ..............................36

*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001) ..... 33, 52

*Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386 (W.D.N.Y. 2017)...47

*Seamons v. Snow*, 206 F.3d 1021 (10th Cir. 2000) ..................................................53

*Stark v. Reliance Standard Life Ins. Co.,* 142 F.4th 1252 (10th Cir. 2025) .............34

*Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106 (10th Cir. 2007)............................32

*Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985) ................................37

**STATUTES**

28 U.S.C. § 1291 ......................................................................................................2

28 U.S.C. § 1331 ......................................................................................................2

N.M.S.A. § 14-3-1 ..................................................................................................21

N.M.S.A. § 37-1-23(A) ................................................................. 3, 55, 56, 57

New Mexico Human Rights Act, N.M.S.A. § 28–1–1 *et seq.* ................. 1, 2, 30, 31

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681(a) iii, 1, 2, 6, 7, 8, 30, 31, 35, 36, 37, 38, 39, 40, 41, 42, 47, 50, 52, 54

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1)...... 1, 2, 30, 31

**RULES**

10th Cir. R. 28.1 ......................................................................................................2

Fed. R. App. P. 28....................................................................................................1

Fed. R. App. P. 4(a) ................................................................................................3

Fed. R. Civ. P. 12(b)(6) ................................................. ii, 3, 30, 31, 33, 35, 36, 57, 59

Plaintiff-Appellant Michael Briggs ("Plaintiff" or "Briggs")[1] respectfully submits this Opening Brief.

## STATEMENT OF RELATED CASES

There are no related district court or appellate cases between these parties. Joy Van Meter (the "Complainant" or "Van Meter") brought a separate case in the same district. *See Vanmeter vs. Briggs*, 18-cv-00970 (D.N.M.). That case was dismissed on March 7, 2020.

## JURISDICTIONAL STATEMENT

Plaintiff filed this case in the United States District Court for the District of New Mexico asserting claims against Appellees-Defendants (collectively "UNM") alleging, *inter alia*, discrimination based on sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681(a) ("Title IX"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"), and the New Mexico Human Rights Act, N.M.S.A. § 28–1–1 *et seq.* ("NMHRA"). Plaintiff also brought claims under New Mexico state common law, including breach of implied employment contract based on UNM's written employment policies.

---

[1] In accordance with Fed. R. App. P. 28(d), Appellant will either "use the parties' actual names or the designations used in the lower court." The District Court referred to Appellant as Plaintiff or Briggs, and sometimes referred to Appellees as UNM, the UNM Defendants, or Defendants. Appellant will collectively refer to Appellees as "UNM".

Plaintiff filed this case in the District Court for the District of New Mexico based upon: (i) federal question jurisdiction, 28 U.S.C. § 1331, because the action arose out of the Constitution and laws of the United States, including the Fourteenth Amendment (Due Process), Title IX and Title VII; and (ii) supplemental jurisdiction, 28 U.S.C. § 1367, because Plaintiff's state law claims arise out of the same facts and circumstances as his federal claims so as to form the same case and controversy (App.Vol.1, 24-56).[2]

On May 23, 2025, the District Court entered final judgment disposing of all claims in the case (App.Vol.4, 1093), after granting summary judgment to UNM against Plaintiffs' Title IX, Title VII, and NMHRA claims, and related requests for injunctive relief and for declaratory judgment. (App.Vol.4, 1032-92). The Judgment disposed of all parties' claims. This appeal is as of right, and the Court of Appeals has jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a). The Notice of Appeal was timely filed on June 22, 2025 (App.Vol.4, 1094).

## STATEMENT OF THE ISSUES

1.     Did the District Court err in granting summary judgment to UNM despite the existence of disputed issues of material fact and wrongly invade the

---

[2] Pursuant to 10th Cir. R. 28.1(A)(1), references to Appellant's Appendix use the convention of appendix volume followed by page number ("App.Vol.1 at __"). Appellant has consecutively paginated the appendix across all four (4) volumes.

province of the jury by making fact and credibility determinations at the summary judgment stage?

2.      Did the District Court err by striking the summary judgment declaration of Dr. Richard Larson averring to multiple, material irregularities in UNM's investigation and discipline of Plaintiff?

3.      Did the District Court err by dismissing Plaintiff's breach of implied employment contract claims pursuant to Rule 12(b)(6) for failure to state a cognizable claim? *Garcia v. Middle Rio Grande Conservancy Dist*., 1996-NMSC-029, ¶ 14, 121 N.M. 728, 732, 918 P.2d 7, 11 (holding that N.M.S.A. § 37-1-23(A) waives governmental immunity in cases alleging breach of implied employment contract based on written terms in personnel policy).

## STATEMENT OF THE CASE

### I.    Statement of Relevant Facts

#### A.    <u>Plaintiff Was an Exemplary UNM Employee</u>

Prior to his termination in August 2018, Plaintiff was a longstanding, "exemplary" employee for the University of New Mexico Health Sciences Center ("UNMHSC"). (App.Vol.3, 613).  From 2006 until 2018, Plaintiff worked in medical research at UNMHSC. (App.Vol.1, 245; App.Vol.3, 604).  During those dozen years, Plaintiff received multiple pay raises, promotions, and only positive performance reviews. (App.Vol.3, 577-578, 604-605). Except for the disputed report of sexual assault at issue here, UNM never received any complaint about Plaintiff for any reason (App.Vol.3, 604). Plaintiff has never been arrested, charged, or convicted of any crime, and was not arrested or charged with any crime in connection with Complainant's report to UNM here.  (*Id.*, 613, 717, 807, 819).

Plaintiff was not a "coworker" of and did not work with Complainant.  At all times, Plaintiff worked in medical research and had no involvement in or oversight of UNMHSC's clinical operations or the delivery of health care by UNMHSC, including the Department of Orthopedics where Complainant was employed until September 2017. (App.Vol.3, 605-607). The Orthopedics Department where Complainant worked was organizationally and physically separate from the Office of Research where Plaintiff worked, and Plaintiff had no supervisory authority over

Complainant, nor any direct or indirect influence on her position or department. (*Id.*).

The District Court's repeated finding that Plaintiff was Complainant's "coworker" is wrong as a matter of fact and was repeatedly disputed in multiple, uncontroverted declarations in the summary judgment record.

B.   <u>UNM Faced Public and Government Pressure to Aggressively Investigate and Discipline Sexual Assault</u>

UNM was a recipient of the 2011 Dear Colleague Letter ("DCL") described and referenced in this Court's opinion in *Doe v. Univ. of Denver* ("*Doe I*"), 952 F.3d 1182, 1192 (10th Cir. 2020) (holding that the DCL by itself is insufficient to support an inference of discrimination without "something more"); *see also Lee v. Univ. of New Mexico*, 500 F. Supp. 3d 1181, 1189 (D.N.M. 2020) (describing content of DCL and potential pressure on UNM).

Three years later, in 2014, the United States Department of Justice (DOJ) received "complaints from multiple students alleging that UNM did not adequately respond to their reports of sexual assault." (App.Vol.3, 623). Some of those complaints arose from a highly publicized incident in April 2014 where three students, including two UNM football players, were accused of kidnapping and raping a female UNM student (App.Vol.3, 660-665).

Between 2014 and 2018, there were multiple media reports – including several front-page newspaper articles – criticizing UNM's handling reports of student sexual assault. *See, e.g.,* Bush, Mike, *DOJ to Investigate UNM's Sexual Assault Response*, The Albuquerque Journal ("ABQJ"), December 6, 2014 (App.Vol.3, 660-662); Bush, Mike, *DOJ's Probe of UNM is Second in Nation*, ABQJ, January 5, 2014 (App.Vol.3, 663-665); Bush, Mike, *Ex-Student Sues UNM Over Alleged Rapes*, ABQJ, February 20, 2015 (App.Vol.3, 666-668); Quintana, Chris, *TITLE IX AT UNM: Sex Assault, Harassment Reports Triple*, ABQJ, April 10, 2016 (App.Vol.3, 669-671); Quintana, Chris, *DOJ Hits UNM on Sexual Assault Policies*, ABQJ, April 23, 2016 (App.Vol.3, 672-674); Sagbakken, May and Kim Alaburda, *Op. Ed: UNM Must Apologize for Inaction*, ABQJ, August 10, 2016 (App.Vol.3, 675-677).

In December 2014, DOJ initiated an investigation of UNM's handling of sexual assault. *See* DOJ Letter of Findings re Title IX and Title IV Investigation of University of New Mexico (issued April 22, 2016) (the "DOJ Findings") at 2 (App.Vol.3, 623-659). In April 2016, DOJ issued an extensive report highly critical of UNM and directed that "UNM must do more to address and respond to sexual harassment that creates a hostile environment, including sexual assault, by effectively stopping harassment, preventing its recurrence, eliminating the hostile environment, and remedying its harms." (*Id.*, 658).

DOJ found that UNM's handling of sexual assault investigations and discipline violated Title IX in multiple ways, including through "improper" interference by high-level administrative officers (App.Vol.3, 644) and outcomes driven by concerns about public "image-building" (App.Vol.3, 653). DOJ threatened that UNM could lose federal funding if it did not take measures to more aggressively investigate and discipline sexual assault. DOJ also criticized UNM for not applying Title IX to investigate complaints by employees: "[t]he fact that individuals tasked with internally reviewing sexual harassment investigations are not aware that Title IX covers employees is evidence of UNM's lack of understanding and failure to train responsible parties as to the scope of the statute." (*Id.*, n. 38). Over the next two years, UNM and DOJ negotiated a settlement agreement to avoid UNM losing federal funding.

In July 2016, UNM's then-President Bob Frank authored an Op. Ed. in the Albuquerque Journal titled "UNM serious about sexual assault issue," and stated: "[s]exual assault is arguably the most disturbing issue on our college campuses nationwide. At UNM, it has become a primary focus over the past few years" and "we are moving aggressively ahead with major changes in our campus wide response." (App.Vol.3, 681-682) (emphasis added).

Shortly thereafter, on October 17, 2016, UNM entered into a settlement agreement with DOJ that required, *inter alia*, that (1) UNM "make all necessary and

7

appropriate revisions to its policies, procedures, and practices regarding campus sexual harassment, including sexual violence;" and (2) "[i]n return, DOJ will not initiate litigation regarding its Title IX and Title IV findings . . . ." *See* Agreement between the United States Department of Justice and the Board of Regents of the University of New Mexico (the "DOJ Agreement") (App.Vol.3, 685).

The DOJ Agreement required, *inter alia*, that UNM be subject to close federal supervision for three (3) years (2016-2019), during which time DOJ would monitor UNM's handling of reports of sexual assault. (App.Vol.3, 696-698, 700). "If the Department determines that the University has failed to comply with the terms of this Agreement or has failed to comply in a timely manner with any requirement of this Agreement, . . . the Department may initiate civil enforcement proceedings in federal court." (App.Vol.3, 699-700).

Only nine (9) days after UNM signed the DOJ Agreement (October 26, 2016), Complainant falsely reported to UNM that Plaintiff had sexually assaulted her (the "Report"). (App.Vol.1, 247).

C.  Statistical Evidence of Gender Bias by UNM

In *Doe v. Univ. of Denver ("Doe II")*, 1 F.4th 822 (10th Cir. 2021), this Court held that a statistical disparity in how a university investigates and disciplines male vs. female respondents can be evidence of pretext. 1 F.4th at 835-36. In accordance with *Doe II*, Plaintiff served discovery requests and later a subpoena on UNM

seeking, *inter alia*, records and information relating to reports of sexual misconduct. (347-350). Importantly, Plaintiff sought UNM files for complaints of sexual misconduct made after the DOJ Agreement and during the time that UNM investigated and disciplined Plaintiff. (*Id.*). UNM objected to and moved to quash the subpoena but was ultimately ordered to produce 371 of its files (the "UNM Files"). (App.Vol.2, 371-72).

The UNM Files provide uncontroverted statistical evidence that UNM treated male respondents differently from female respondents when investigating, making findings on, and imposing discipline for complaints involving sexual misconduct. (App.Vol.3, 572-574). The UNM Files included 269 male respondents and 102 female respondents. Of the 269 complaints made against male respondents, 126 (or 46.9%) were investigated by UNM. (*Id.*). By contrast, of the 102 complaints made against female respondents, only 7 (or 6.9%) were investigated by UNM. Male respondents were investigated by UNM at a rate 6.8 times greater than female respondents. (*Id.*). "[T]he University has control over which complaints it decides to formally investigate." *Doe II*, 1 F.4th at 835.

UNM also found that male respondents had violated sexual misconduct policies far more frequently than female respondents. Of the 269 complaints made against male respondents, 78 (or 29%) resulted in a finding of a policy violation. (*Id.*). By contrast, of the 102 complaints made against female respondents, only 1

(or <1%) resulted in a policy violation. (*Id.*). Male respondents accused of sexual misconduct were found to have violated UNM policy at a rate 29.6 times greater than female respondents. (*Id.*). "Because 'screening out,' referral, or finding there is "insufficient information" to proceed with a case are highly discretionary decisions, the statistical sex disparity in the University's resolution of these complaints suggests anti-male bias could be influencing outcomes." *Doe II*, 1 F.4th at 835.

UNM also disciplined male respondents more severely than female respondents. Of the 269 complaints against male respondents, 52 resulted in the most severe disciplinary actions (termination, sanctions, suspension, or expulsion) against male respondents. (*Id.*). Of 102 complaints against female respondents, only one female respondent received any discipline (expulsion). (*Id.*).

The undisputed statistical evidence before the District Court was that UNM investigated, found against, and disciplined male respondents at significantly higher rates than female respondents. (*Id.*). The sample size for UNM was significantly larger than the statistical evidence in *Doe II*, and thus stronger evidence to support both a prima facie case of discrimination and pretext.

D.    The False Report of Sexual Assault Against Plaintiff

On October 26, 2016, nine (9) days after UNM signed the DOJ Agreement, Complainant falsely reported to UNM that Plaintiff had sexually assaulted her. Under pressure from DOJ to be more aggressive in investigating and "eliminating" sexual assault, UNM conducted a biased investigation, ignored all evidence that supported Plaintiff's version of events, ignored Complainant's destruction of key evidence (e.g., deletion of texts arguing with her Ex-Husband and threatening to kiss Plaintiff), failed to interview key witnesses (including another man that Complainant falsely accused of sexual assault), and ultimately made all credibility and other findings against Plaintiff. Plaintiff has at all times adamantly denied that he sexually assaulted Complainant and steadfastly maintained that the limited sexual activity between them was consensual.

At the time of the disputed sexual activity, Plaintiff was forty-seven years old and a divorced father of two children. Complainant was thirty-four years old, and a mother in a volatile marriage that was deteriorating. These were middle-aged adults, and neither the Plaintiff nor Complainant were UNM students at the time of their sexual activity. It is undisputed that all of their interactions on the day in question occurred off-campus and were wholly unrelated to UNM. (App.Vol.3, 702-717). In fact, UNM's President Garnett Stokes herself found that "the October 14, 2016

outing was not work-related because it occurred outside the workplace and was not planned for the purpose of carrying out work-related functions." (App.Vol.4, 831).

At the time of their sexual activity, Plaintiff and Complainant had known each other for over two years. (App.Vol.3, 719, 748, 772). The two initially met while participating in UNM's Executive MBA Program, but both had already graduated in July 2016. (*Id.*, 748). The two thereafter began to meet alone for drinks at a local restaurant after work once or twice a month. (*Id.*, 719). Over time, the two started confiding in each other and shared intimate details of their lives, including that Complainant and her then-husband Michael Ellis (the "Ex-Husband") almost divorced several times. (*Id.*, 772). On the day of their sexual activity (October 14, 2016), the two again met at the restaurant after work where the two talked again about Complainant's marital troubles. (*Id.*)

       1.    *The Fight: "How Would You Like It if I Kissed Michael Briggs?"*

In the weeks leading up to their sexual activity, Complainant and her Ex-Husband had repeatedly fought because he kissed another woman in a play in which he was performing. (App.Vol.3, 756-757, 803). This fight dramatically escalated on October 14, 2016 – the day of the sexual activity in dispute – after Complainant became aware that a local magazine had published a picture of her Ex-Husband kissing the woman. (*Id.*, 791). "[S]tarting at midday," and continuing on and off for

approximately four hours, Complainant and her Ex-Husband exchanged multiple texts fighting about the magazine picture and the kiss (the "Fight"). (*Id.*, 756, 799-800) ("she had seen . . . a promotional picture of the play . . . it was a picture of this girl kissing me on the cheek and it pissed her off.").

The Fight was by far the worst that Complainant and her Ex-Husband had ever had during their marriage (they are now divorced). (*Id.*, 802-804). The Fight became so severe that the Ex-Husband decided that, for the first time during their marriage, he would take a "time out," and that he and their daughter would spend that night away from the family home at his mother's house. (*Id.*, 802-804) ("I decided to take a timeout. I didn't want to have that argument again. So I decided to go stay the night at my mom's.").

When the Ex-Husband sent a text message to Complainant that he was going to take a "time out" and take their daughter to stay overnight with his mother, Complainant sent a text message to the Ex-Husband stating: "How would you -- how would you like it if I kissed Mr. Briggs. (App.Vol.3, 806) ("Q. And she told you that she was going to have drinks with him that afternoon? A. Yes, which was not uncommon.").

## 2.    *Complainant Proposed to Meet at Plaintiff's House*

During this Fight with her Ex-Husband, and while she was meeting Plaintiff at the restaurant, Complainant asked when she could see Plaintiff's new home, and both decided to drive separately to Plaintiff's home right then. (App.Vol.3, 720, 772). The two met at Plaintiff's home and talked for several hours. (App.Vol.3, 772-774).

At some point during the afternoon, Complainant told Plaintiff that she had vomited in the bathroom, after which the two continued to talk for close to an hour while Complainant drank water. (*Id.*). Complainant later told Plaintiff that she thought that she could smell vomit in her hair, and Plaintiff offered to let her use his shower, which she accepted. (App.Vol.3, 774). Plaintiff showed Complainant to the bathroom, where she started to untie her dress in front of him. *Id.* This prompted Plaintiff to ask Complainant if he could join her in the shower and Complainant said "yes." (*Id.*)

Plaintiff then got into the shower with Complainant, kissed her, and Complainant "responded"; and they "made out." (*Id.*) Plaintiff then kissed various parts of Complainant's body – the two never had sexual intercourse. (*Id.*) After Plaintiff had been in the shower with Complainant for a "few minutes," she said, "I gotta go. I have to be home by 6:00 pm," at which point Plaintiff said, "Okay," stopped all sexual activity, and turned off the water and the two got dressed. (*Id.*)

Complainant requested that Plaintiff drive her home, he agreed, and then drove the Complainant to her house, where her Ex-Husband was outside waiting. (*Id.*, 774). Plaintiff then had an awkward interaction with her Ex-Husband while Plaintiff went inside. *Id.* The Ex-Husband left the home and did not come home that night because "He was pissed off at me . . . . He had thought I had gone out and gotten trashed as a retaliation." (*Id.*, 723).

Complainant and her Ex-Husband exchanged text messages (which were then deleted) and also talked by phone about the night before:

> [O]n Saturday when she kind of described events to me on the phone . . . I started to freak out and I got mad, and I was like, you know, this happened because you were pissed at me and you did, you know, *whatever*. I kind of was a dick and lost my cool a little bit. And then – and I said, you know, whatever, like *we need a break* or something like that.
>
> And I hung up and I texted her a little bit later and I started to – I forget if I texted her or called her or something later in the afternoon because I was just planning on keeping [our daughter] with me again at mom's house for the night on Saturday.

(App.Vol.3, 764-765).

The Ex-Husband doubted that Complainant had been sexually assaulted and pressured her to report it to authorities if that was indeed true. Complainant initially resisted the pressure to contact the police until her Ex-Husband threatened to take a break from the marriage and keep their daughter with him at his mother's house.

A reasonable jury could conclude that (1) Plaintiff and Complainant met at his home and engaged in consensual sexual activity; (2) that Complainant told her Ex-Husband that she was sexually assaulted to avoid admitting infidelity; and (3) that Complainant only claimed she was sexually assaulted after her Ex-Husband threatened to leave her and take their child.

### 3. *Complainant Deleted Exculpatory Evidence*

Notably, when Complainant later reported the disputed sexual activity to law enforcement, she did not disclose the Fight to the Albuquerque Police Department (APD) during its investigation.

> DETECTIVE SPINKS: [W]ith regard to you and your wife's argument and she was upset with you about kissing this other girl in the play -- and that's not something she mentioned to me in the interview. I knew you guys had an argument. I don't know what it's about. But I could easily see that the defense argument is going to be that she was just trying to, you know, get even --
>
> MR. ELLIS: Right.
>
> DETECTIVE SPINKS: -- and maybe things went further than she wanted but that she put herself in that situation. Is there anything in your wife's past or anything that your wife has -- during your argument, would you have any reason to believe that she purposefully put herself in that position even if it did go further than she wanted?

(App.Vol.3, 766).

During his APD interview, the Ex-Husband disclosed the Fight, Complainant's threat to kiss Plaintiff, and other texts that would have supported the Plaintiffs' version of events that the sexual activity was consensual:

> I'll just go ahead and come out and say it . . . because you're going to end up reading all of her text messages anyway, and this was kind of our concern.  And I do understand that this is something that the defense could discover and so just to kind of preempt any of that, one of the things that bothered her – two things were going on and this will be corroborated by the MHC medical report.  One, she was having a major depressive episode, which I don't know if she disclosed that to you or not.
> . . . .
> And then my kissing this girl was a stressor. . . . I'm kissing this girl and her brain chemicals are off so she gets really upset and kind of fixates on me kind of kissing this girl.
>
> And she asked me in some text messages to me, you know, like how would you feel – things like how would you feel if I went and kissed some guy from work? And she even said, how would you feel if I went and kissed Michael?  You know, I'm going and having a beer with him.  How would you feel if I did that?

(App.Vol.3, 768).

> And to read those text messages you might think, oh, well, here she's implicating herself that she's going to go like anger fuck this guy, you know, just to get back at her husband for kissing this girl and all this.

(*Id.*)

The APD detective acknowledged that "those messages that you were describing could be considered exculpatory, so I would be obligated to provide those too – as part of my report."  (App.Vol.3, 769).  "I would be obligated at the very least

to provide them to the DA so that they can consider that when they're trying to decide if they're going to file a charge against him."  (App.Vol.3, 770).

Neither Complainant nor her Ex-Husband produced any of these exculpatory texts to APD or to UNM because both had purposely deleted all texts between them before Complainant made any report to APD or UNM.  (App.Vol.3, 721, 793) ("Q. Did you delete all of these text messages between you and your husband?"  "Yes."). Complainant also deleted all of her text communications with the Plaintiff. (App.Vol.3, 795). After Complainant denied any infidelity and her Ex-Husband pressured Complainant to report the sexual activity to law enforcement, Complainant submitted to DNA and multiple drug tests – all of which were negative, and support Plaintiff's version of events.  (App.Vol.3, 808-811).  Law enforcement did not arrest Plaintiff, he was never charged with any crime, and the Bernalillo County District Attorney's Office declined to prosecute due to lack of evidence. (App.Vol.3, 807).  While not dispositive, that fact demonstrates that an objective factfinder could neutrally review the same evidence as UNM and conclude that Plaintiff did not sexually assault Complainant.

E.    Biased and Irregular Investigation by UNM

At the urging of her Ex-Husband, Complainant also reported the sexual activity to UNM on or about October 26, 2016 (the "Report"). (App.Vol.3. 771). The only "Applicable University Policy" identified by UNM in its notice to Plaintiff was "University Policy #2740 Sexual Violence and Sexual Misconduct." (App.Vol. 3. 771) *Id.* UNM would later terminate Plaintiff's employment based on multiple policies that Plaintiff never received notice that he was alleged to have violated. (App.Vol.3, 408-435).

UNM did not attempt to promptly collect or preserve any evidence, or to timely interview any potential witnesses, and did not complete its investigation until over a year after the Report, in December 2017. On December 4, 2017, UNM's investigator, Laura Vele Buchs, notified Plaintiff that she had completed her investigation and issued a Preliminary Letter of Determination (PLOD) (App.Vol.2, 408-435). The PLOD made virtually all fact findings, inferences, and credibility determinations against Plaintiff. (*Id.*) The investigator concluded that Plaintiff "more likely than not" subjected Complainant to unwelcome sexual activity. (*Id.* at 2, 435).

UNM's investigator ignored the Fight, the threat to kiss Plaintiff, and the fact that both Complainant and her Ex-Husband deleted potentially exculpatory texts. UNM's investigator never asked either witness about the content or deletion of the

exculpatory texts or acknowledged that Complainant had deleted texts. Nor did UNM's investigator consider whether the intentional destruction of relevant evidence should weigh against Complainant's credibility.

There were many deficiencies and procedural irregularities during UNM's investigation. For example, UNM's investigator also failed to interview a witness apparently identified to support Plaintiff's version of events, Zack Dillenback. Like Plaintiff, Dillenback was a former classmate who graduated from UNM's Executive MBA program. Discovery in lawsuits would later uncover that Complainant and Mr. Dillenback had an extramarital relationship during a time that Complainant considered her marriage to be an "open relationship." (App.Vol.4 at 838). Had UNM interviewed Dillenback, UNM would also have learned that Complainant kissed Dillenback after having drinks with Dillenback at a bar, similar to her interaction with Plaintiff. (App.Vol.4, 835). Dillenback's statement, if ever sought by UNM, would have supported Plaintiff's version of events. UNM claimed that Dillenback "did not provide a statement to UNM." (App.Vol.2, 423) ("Witness 8 did not provide a statement to the OEO"). But Dillenback testified under oath that UNM never attempted to contact him. (App.Vol.4, 837).

Despite a litigation hold, and in violation of UNM policy,[3] UNM deleted the email account of the UNM investigator who made fact findings against Plaintiff. (App.Vol.1, 242) ("Defendants admit [that] the UNM OEO investigator's email account was deleted."); (App.Vol.4, 849-851) ("Ms. Vele Buchs left her employment at UNM effective July 2, 2018. Unfortunately, her email account was deleted . . ."). The UNM investigator was the sole factfinder for UNM, and the deletion of her entire email account was both contrary to New Mexico law and an egregious spoliation of evidence. Those emails would have confirmed whether or not the UNM investigator made any attempt to contact Dillenback by email, or whether she failed to contact him, as Dillenback testified, and simply chose against getting a statement from a witness that would support Plaintiff's version of events.

UNM also deleted emails of the UNMHSC executive who was initially designated to discipline Plaintiff – emails in which that executive was attempting to document his concerns about UNM's highly irregular disciplinary process and questionable conduct. (App.Vol.3. 583).

---

[3] UNM's document retention policy requires that it preserve university records, including email communications, in accordance with the State of New Mexico Retention Schedules. UAP 6020, § 5.1 Records Retention Schedules. The New Mexico Public Records Act, Section 14-3-1 *et seq*. NMSA 1978 requires that state agencies preserve records relating to its investigations of employees for three (3) years from the date of separation of the employee. NMAC 1.21.2.230.

Notably, Complainant provided false testimony when asked under oath in her deposition whether she had ever kissed Dillenback. (App.Vol.3, 798, App.Vol.4, 838). Complainant's willingness to make false statements under oath in her own lawsuit could reasonably support a jury finding in this action that Plaintiff did not sexually assault Plaintiff, and that UNM's investigations resulted in an erroneous outcome.

Another example of procedural irregularity is that fact that UNM's investigator misled at least one witness by falsely representing that Plaintiff had admitted wrongdoing.

> During my interview, I expressed some surprise at Ms. Van Meter's allegations against Mr. Briggs given my knowledge of his character over such a long period of time. Investigator Vele-Buchs responded, "Well, you may have that view of Michael, but he has admitted to wrong-doing." In my prior experience with OEO investigations, I have never observed an investigator make such a comment on a pending investigation.

(App.Vol.3, 606). A reasonable factfinder could conclude that the UNM investigator's attempt to mislead a witness she considered to support Plaintiff's version of events was intended to chill or deter any statement inconsistent with a finding of sexual misconduct.

In the PLOD, the same investigator wholly ignored the negative DNA test and two negative drug tests, including (1) a preliminary drug screen for common "date rape" drugs conducted by the UNM Mental Health Clinic (MHC) the day after the

alleged sexual assault; and (2) a more comprehensive drug screen conducted by the FBI Crime Lab in Quantico, VA at APD's request. (App.Vol.3, 808) (App.Vol.3, 810-811). Complainant accused the Plaintiff of drugging her – which he adamantly denied – the negative drug screens supported his version of events and should have been considered.

In the PLOD, the UNM investigator also ignored that Plaintiff – a 47-year old father of two – had never previously been accused of any misconduct whatsoever, much less any crime. (App.Vol.4, 819). The lack of any past complaint against Plaintiff is and should have been evidence that supports his version of events.

In the PLOD, the UNM investigator made virtually all findings against Plaintiff, but then ultimately found that "there is no objective evidence of unreasonable interference in [the accuser's] work performance and/or environment" because they did not work together. (App.Vol.2. 434). The UNM Investigator ultimately concluded that there was "No Policy Violation" because there was "not sufficient evidence to show more likely than not [that Plaintiff] subjected [Complainant] to unwanted conduct of a sexual nature that unreasonably interfered with [her] work performance and work environment . . . ." (*Id.,* 435). UNM then confirmed its preliminary determination in a Final Letter of Determination ("FLOD") and gave both parties five (5) business days to appeal that decision. (App.Vol.4. 821-823).

Plaintiff submitted a letter disputing and challenging the UNM investigator's fact "findings" against him but acknowledged that there was no need for him to appeal the decision because UNM's investigator had ultimately found "No Policy Violation" and recommended closure of the file without further action. (App.Vol.4. 824-825).

F.    Ex Parte Appeal and Reversal by UNM President

Without notice to Plaintiff, UNM extended <u>only</u> the time for Complainant to file an *ex parte* appeal to UNM's President until January 2, 2018. (App.Vol.4. 826-830). Plaintiff was not provided with a copy of Complainant's *ex parte* appeal, nor given any opportunity to respond to it or submit a cross-appeal on the UNM investigator's fact findings against him. Plaintiff was wholly unaware of the substance of the appeal until after UNM's new President, Garnett Stokes, abruptly issued a letter decision reversing the finding of "No Policy Violation" on March 29, 2018. (App.Vol.4. 831- 832).

In reversing the "No Policy Violation" determination, and finding that Plaintiff had violated multiple UNM policies, President Stokes first confirmed that "the October 14, 2016, incident itself was not work-related." (App.Vol.4. 831). UNM's President nevertheless reversed the finding of "No Policy Violation" after "accepting the unchallenged factual findings as true" and finding that Plaintiff might

create a hostile work environment based on Plaintiff' "<u>potential</u> negative influence in [Complainant's] work environment." (App.Vol.4. 831) (emphasis added).

But Plaintiff did challenge the factual findings in the PLOD. (App.Vol.4 at 825). Moreover, "[t]he Department of Orthopedics is organizationally and physically separate from the Office of Research, where Mr. Briggs work[ed]." (App.Vol.3. 606-607) "Ms. Van Meter [did] not work in the same building as Mr. Briggs." (App.Vol. 3. 606-607). "Mr. Briggs has no supervisory authority over Ms. Van Meter; she [was] completely outside of Mr. Briggs's chain of command at UNM." (App.Vol. 3. 606-607). Additionally, Plaintiff could not have created a "potential" negative influence in [Complainant's] work environment" because, by the time UNM's President reversed the finding of "No Policy Violation" Complainant no longer worked for UNM. (App.Vol.4. 833).

The claim by the UNM President that Plaintiff could "potentially" have a negative influence on Complainant's work environment was contradicted by UNM's own actions up to that point. During the investigation of Complainant's Report, no one at UNM ever raised any concern about Plaintiff creating any potential negative influence on Complainant or proposed any interim measure to protect against a hostile work environment.

> Prior to April 2018, no one at UNM raised any concerns with me about Mr. Briggs potentially interfering with Ms. Van Meter's work while she was employed at UNM HSC. I was not asked by UNM OEO, nor the

UNM President, nor Ms. Van Meter nor anyone else at UNM to take any interim action to limit Mr. Briggs' movements on campus or to protect against any potential interaction between Ms. Van Meter and Mr. Briggs. No one at UNM ever raised any concern that Mr. Briggs' employment at UNM HSC might create a hostile work environment for Ms. Van Meter while she was employed at UNM HSC.

(App.Vol.3. 586).

The *ex parte* decision by the UNM President to reverse UNM's finding of "No Policy Violation" was highly irregular, wholly unfair to Plaintiff, and demonstrably false.

G.     UNM's Irregular and Biased Imposition of Discipline

After the *ex parte* reversal by UNM's President, UNM then designated Plaintiff's immediate supervisor, Dr. Richard Larson, to discipline Plaintiff. (App.Vol.4. 815). Dr. Larson served as the Executive Vice Chancellor for UNM HSC (the second highest position at UNM HSC) and Vice Chancellor for Research. (App.Vol.3. 586).

Plaintiff's disciplinary process was highly irregular. Plaintiff's supervisor, Dr. Larson, was repeatedly pressured to terminate Plaintiff's employment by multiple female executives who would not normally participate in the UNM's disciplinary procedures. (App.Vol.3. 579). Dr. Larson was provided with an incomplete file and was misled to believe that Plaintiff had not disputed the fact findings in OEO's PLOD. (App.Vol.3. 579).

I told the UNM Administrators that "[g]iven that I was being told I needed to sanction on OEO's finding in the PLOD of 'sexual misconduct of severe type' and that I was only to see a very limited set of documents. I asked if that finding was disputed and if the respondent had been given appropriate appeal opportunities- or that I could be given an assurance that appropriate appeal rights had been offered." The UNM Administrators "indicated that there was no written or established appeal process regarding situation presented by the complexities of this case." The UNM Administrators "further indicated that the respondent had not appealed the PLOD, and that the respondent and his lawyer should have known to appeal a PLOD which had a favorable determination but underlying findings that would be harmful if the determination was reversed." The UNM administrators "stated that because the respondent did not appeal the findings, I should view this as evidence that he did not dispute the finding." The UNM Administrators "admitted that the respondent was not informed of the appeal of Complainant and that there was some 'exposure' there."

(App.Vol.3. 584-585) (emphasis added).

UNM's regular practice and policy is that UNM does provide the "sanctioner" with the evidence/exhibits relied on in the PLOD, and UNM admitted that Dr. Larson should have been provided with that evidence during Plaintiff's disciplinary phase. (App.Vol.4. 852-855). Dr. Larson ultimately felt compelled to recuse himself because, *inter alia*, he "was increasingly concerned that the disciplinary process for Mr. Briggs was irregular and biased." (App.Vol.3. 581).

After Plaintiff's employment was terminated, Dr. Larson became aware that "Mr. Briggs had in fact disputed the findings in the PLOD contrary to the UNM Administrators' representations to me." (App.Vol.3. 585). After Dr. Larson recused himself, Dr. Paul Roth – who was then the Executive Vice President and Chancellor

of UNM HSC and Dean of the School of Medicine – was directed by the UNM Administrators to discipline Plaintiff. (App.Vol.3. 580-581).

> When I later discussed Mr. Briggs' potential discipline with Dr. Roth, he acknowledged that UNM's Administrators were insistent that Mr. Briggs be terminated. Dr. Roth told me, *inter alia*, that another administrator involved in the process, Chamiza Pacheco de Alas (UNM HSC Chief of Staff to the Executive Vice President), told him that **she wanted to "cut Michael's dick off."** It became clear to me that the UNM Administrators, as well as UNM's President and other administrators – all of whom were female – were intent on firing Mr. Briggs regardless of the evidence or procedural problems.

(App.Vol.3. 580-581) (emphasis added).

Dr. Roth did not want to terminate Plaintiff, but was also pressured by UNM's Vice President of Human Resources, Dorothy Anderson to fire Plaintiff. (App.Vol.3. 613-614).

> Q.   Dr. Roth expressed to you that he didn't want to fire Mr. Briggs, he wanted to do something less than that, correct?
> A. ·· He had concerns with that level of discipline, yes.
> Q.·· Okay.··And I understand that he had concerns.··What I'm specifically asking is:··He wanted to reduce the discipline, correct?
> A. ·· Yes.

(App.Vol.4. 865) ("Q ·[Dr. Roth is] telling you that he wants some discipline less than termination, correct? A.·Yes. Q.·And you're telling him you want termination, correct? A.·Yes.").

Having UNM's Vice President of Human Resources intervene to fire an employee is highly irregular. According to Anderson, the regular discipline process

for UNM's Human Resources Department is that a staff member of the Client Services Division "normally oversees employee discipline and termination." (App.Vol.4. 857, 859). Anderson admitted that UNM did not follow its regular procedure when UNM terminated Plaintiff's employment because, according to UNM, Plaintiff's case was "something that may be of public interest, [of a] sensitive nature." (App.Vol.4. 859). Rather than follow UNM's regular procedure, Anderson admitted that "OEO brought the complaint directly to me" because "[i]t was a high level employee" and the complaint was "very sensitive." (App.Vol.4. 859). Anderson testified that: "So based on that high level and sensitivity, I chose to work directly with the department." (App.Vol.4. 859). When asked whether she had ever intervened in employee discipline before, Ms. Anderson could only identify three high profile investigations involving a UNM president, UNM's head football coach, and UNM's head soccer coach – all male employees. (App.Vol.4. 859).

At the direction of UNM's President, Vice President of Human Resources, and other female administrators, Dr. Roth terminated Plaintiff's employment in August 2018. (App.Vol.2, 478-479).

## II. Statement of Relevant Procedural History

Plaintiff filed the Complaint on July 2, 2020 (App.Vol.1, 24-55). On November 4, 2020, UNM moved under Rule 12(b)(6) to dismiss several claims, including Plaintiff's claim for Breach of Implied Employment Contract (Count VI),

on grounds that UNM is immune from such claims. (App.Vol.1, 70-89). The District Court held a hearing on August 24, 2021, (App.Vol.2, 265-335), deferred ruling and took the motion under consideration. (App.Vol.1, 228-231). On September 22, 2021, the District Court entered a preliminary Order dismissing Plaintiff's breach of implied employment contract claim pursuant to the New Mexico Tort Claims Act. (App.Vol.1, 232-240). The District Court stated that a further memorandum explaining the decision would be issued, however, the case was later transferred to a different Article III judge who then ruled that no further order would be issued. (App.Vol.2, 336-337).

On December 20, 2024, UNM filed a Motion to Dismiss and for Summary Judgment against Plaintiff's discrimination claims under Title IX, Title VII, and NMHRA, and the other relief sought in the Complaint. (App.Vol.2, 377-487). On February 27, 2025, UNM separately filed a motion to strike Plaintiff's summary judgment evidence, including the declaration of Dr. Larson. (App.Vol.2, 488-516). On May 23, 2025, the District Court issued a Memorandum Opinion and Order that (1) struck or excluded the Larson Declaration; and (2) granted summary judgment against Plaintiff's discrimination claims brought under Title IX, Title VII, and NMHRA, and (3) denied all other relief sought by Plaintiff, including a claim for injunctive relief and declaratory judgment. (App.Vol.4, 1032-1092). Judgment was

entered on May 23, 2025, disposing of all claims in the case (App.Vol.4, 1093).

Briggs timely filed a Notice of Appeal on June 22, 2025 (App.Vol.4, 1094).

## III. Rulings Presented for Review

Plaintiff appeals from the District Court's Memorandum Opinion and Order entered on May 23, 2025, granting summary judgment against Plaintiff's sex discrimination claims under Title IX, Title VII, and the NMHRA, striking the declaration of Dr. Richard Larson, and dismissing all of Plaintiff's claims with prejudice. (App.Vol.4, 1032-1092).

Plaintiff further appeals from the District Court's Order entered on September 22, 2021, granting UNM's Rule 12(b)(6) motion to dismiss Plaintiff's claim for breach of implied employment contract. (App.Vol.1, 232-240).

## SUMMARY OF THE ARGUMENT

The District Court erroneously granted summary judgment against Plaintiff's discrimination claims brought under Title IX, Title VII, and the NMHRA despite uncontroverted evidence that: (1) there was heavy pressure from the public and DOJ that UNM more aggressively investigate and discipline reports of sexual assault at the same time Complainant complained to UNM about Plaintiff; (2) there was significant evidence that contradicted the Complainant's Report and from which a reasonable jury could find that UNM erroneously found that Plaintiff sexually assaulted Complainant; (3) UNM conducted a one-side investigation against

Plaintiff; (4) UNM's investigation and discipline of Plaintiff suffered from multiple, material procedural defects; and (5) statistical analysis of 371 complaints of sexual misconduct show that, during the relevant period, a male respondent accused of sexual misconduct was 6.8 times more likely to be investigated by UNM, 29% more likely to be found to have violated UNM policy, and far more likely to suffer severe discipline (only one female was disciplined at all). *Doe II*, 1 F.4th 822, 829–30 (10th Cir. 2021) ("where there is a one-sided investigation plus some evidence that sex may have played a role in a school's disciplinary decision, it should be up to a jury to determine whether the school's bias was based on a protected trait or merely a non-protected trait that breaks down across gender lines.").

To support its grant of summary judgment, the District Court improperly struck, excluded, or disregarded some or all of the Declaration of Dr. Richard Larson (the "Larson Declaration") (App.Vol.3, 576-601). Dr. Larson's uncontroverted declaration details numerous deficiencies and procedural irregularities in UNM's investigation and discipline of Plaintiff which constitutes evidence of pretext. *Doe II*, 1 F.4th at 832; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007) ("disturbing procedural irregularities surrounding an adverse employment action may demonstrate that an employer's proffered nondiscriminatory business reason is pretextual."); *Bird v. W. Valley City*, 832 F.3d 1188, 1203 (10th Cir. 2016) ("Such irregularities can be sufficient to call into question the [University]'s honesty

and good faith in making the [disciplinary] decision and, consequently, establish pretext."). The District Court's decision to exclude or strike relevant evidence was an abuse of discretion. "Contradictions in a witness's testimony do not, without more, justify preclusion of that testimony." *King v. Est. of Gilbreath*, 215 F. Supp. 3d 1149, 1160 (D.N.M. 2016) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001)).

The District Court erroneously dismissed Appellant's breach of implied employment contract claim pursuant to Fed. R. Civ. P. 12(b)(6) on grounds that it was barred by the New Mexico Tort Claims Act. (App.Vol.1, 237-239). That claim is not a tort, is not subject to NMTCA, and the New Mexico Supreme Court held that written personnel policies of government entities can be enforceable contracts. *Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶¶9-20, 121 N.M. 728, 731-35, 918 P.2d 7, 10-14 ("[W]e hold that this implied employment contract, which includes a written personnel policy, constitutes a "valid written contract" required to waive governmental immunity under Section 37–1–23(A).").

## ARGUMENT

### I. Standard of Review

#### A. <u>Summary Judgment</u>

The Court "review[s] a district court's grant of summary judgment de novo and consider the facts and all reasonable inferences in favor of [Plaintiff], the party

opposing summary judgment." *Doe II*, 1 F.4th at 825 (citation omitted). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"It is not the duty of the trial court to weigh the evidence between the plaintiff and the defendant on a motion for summary judgment. Nor is it the purpose of the summary judgment remedy to serve as a substitute for a trial . . . ." *Barber v. Gen. Elec. Co.*, 648 F.2d 1272, 1278 (10th Cir. 1981). "The [District Court] may not make credibility determinations or weigh the evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1175 (10th Cir. 2001) (quotations and citation omitted)). The party moving for summary judgment (UNM) must demonstrate entitlement to judgment "beyond a reasonable doubt[,] and if an inference can be deduced from the facts whereby the non-movant might recover, summary judgment is inappropriate." *Barber*, 648 F.2d at 1276 n.1 (emphasis added) (citations omitted).

B.    Rule 12(b)(6) Dismissal for Failure to State a Claim

The Court reviews de novo the District Court's grant of the Rule 12(b)(6) motion to dismiss Plaintiff's claim for breach of implied employment contract. *See, e.g., Stark v. Reliance Standard Life Ins. Co.,* 142 F.4th 1252, 1256 (10th Cir. 2025)

("A complaint's legal sufficiency is a question of law, so we review de novo a district court's decision on a Rule 12(b)(6) motion for dismissal for failure to state a claim.") (citations omitted).

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

## C. District Court Decision to Exclude or Strike Evidence on Summary Judgment

Where "a party challenges the district court's underlying decision to exclude evidence at the summary-judgment stage, we review that underlying decision for abuse of discretion." *Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205, 1210 (10th Cir. 2022) (citing *Doe I*, 952 F.3d at 1191 (10th Cir. 2020)).

## II. The District Court Erred by Granting Summary Judgment to UNM on Briggs' Title IX Claim

Title IX provides that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. Title IX was enacted to "avoid the use of federal resources to support discriminatory practices" and "to

provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979).

"Where sex-based discrimination is intentional, Title IX is enforceable through a cause of action for which money damages are available." *Doe II*, 1 F.4th at 828 (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005)). UNM's termination of Plaintiffs' employment is an adverse action for which UNM can be held liable under Title IX. "[T]he provision implying Title IX's private cause of action, 20 U.S.C. § 1681(a), encompasses employees, not just students." *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 562 (3d Cir. 2017) (citing *North Haven Board of Education v. Bell*, 456 U.S. 512, 520 (1982) (holding that Section 1681(a)'s "broad directive" that no "person" may be discriminated against based on sex, encompasses "employees as well as students.")).

The three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to "Title IX sex discrimination claims." *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017). Under the *McDonnel Douglas* framework, Plaintiff bears the initial burden of showing that "his sex was a motivating factor in the school's investigation and disciplinary decision." *Doe II*, 1 F.4th at 829 (citing *Hiatt*, 858 F.3d at 1316). If Plaintiff "clears that hurdle, then the burden shifts to UNM to articulate a legitimate, nondiscriminatory reason for its decision." *Doe II*, 1 F.4th at 829 (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220

F.3d 1220, 1226 (10th Cir. 2000)).  If UNM does so, then the burden shifts back to Plaintiff to show "a genuine issue of material fact as to whether the proffered reason is pretextual." *Ibid*.

"The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence." *Doe II*, 1 F.4th at 829 (10th Cir. 2021) (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

"The Tenth Circuit and other courts have recognized that a plaintiff may establish a prima facie case of Title IX discrimination in several ways, including but not limited to, "erroneous outcome" and "selective enforcement" theories of Title IX liability. *Doe II*, 1 F.4th at 829–30 (cites omitted). The Tenth Circuit has recognized that these are not the only analytical tests from which a Plaintiff may show Title IX sex discrimination, but rather that "evidence of an erroneous outcome or selective enforcement are means by which a plaintiff might show that sex was a motivating factor in a university's disciplinary decision." *Id.*; *see also Doe v. Rollins Coll.*, 77 F.4th 1340, 1351 (11th Cir. 2023) ("these two tests 'do not capture the full range of conduct that could lead to liability under Title IX,' but instead 'simply describe [two] ways in which a plaintiff might show that sex was a motivating factor in a university's decision.'").

We see no need to superimpose doctrinal tests on the statute. All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student. We prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against John "on the basis of sex"?

*Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019).

The Tenth Circuit has not limited Title IX to specific theories, and instead adopted a straightforward approach: "the operative question for summary judgment [is]: Could a reasonable jury—presented with the facts alleged—find that sex was a motivating factor in the University's disciplinary decision?" *Doe II*, 1 F.4th at 829–30 (cites omitted).

A plaintiff can establish pretext, and therefore avoid summary judgment, by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [UNM's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the [UNM] did not act for the asserted nondiscriminatory reasons." *Doe II*, 1 F.4th at 829 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

A Title IX Plaintiff can establish pretext through statistical evidence of differential treatment of male vs. female respondents. *Doe II*, 1 F.4th at 829–30 (reversing summary judgment and holding that a Title IX plaintiff can demonstrate gender bias by statistical disparity in the gender make up of a university's sexual

misconduct investigations, determinations, and discipline). "Title IX plaintiffs challenging the outcome of a sexual-misconduct proceeding will rarely have direct evidence or even strong circumstantial evidence sufficient to overcome a school's 'anti-respondent, not anti-male' argument,'" but the statistical analysis in *Doe II* was sufficient for the Plaintiff "to satisfy his burden of showing that under *McDonnell Douglas* that the University's explanations of its conduct were pretextual," such that the District Court's grant of summary judgment was reversed. *Doe II*, 1 F.4th at 835–36.

A.    <u>The Record Contains Sufficient Evidence to Create a Genuine Dispute of Material Fact as to Gender Bias</u>

"Under the 'erroneous outcome' test, a plaintiff must set forth '(1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) 'a particularized causal connection between the flawed outcome and gender bias.'" *Doe II*, 1 F.4th at 829–30 (quotation omitted). "To state a Title IX erroneous outcome claim, a plaintiff must plausibly allege 'both that he was innocent and wrongly found to have committed an offense and that there is a causal connection between the flawed outcome and [sex] bias.'" *Doe v. Rollins Coll.*, 77 F.4th at 1354 (quotation omitted).

### 1. *Evidence of External Pressure on UNM Supports Inference of Sex Discrimination*

While not dispositive, "[e]xternal pressure on a university to demonstrate that it acted vigorously in response to complaints by female students may support an inference that a university is biased based on sex . . . ." *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020); *see also Doe v. Purdue Univ.*, 928 F.3d at 668-69. External pressure can "provide[ ] a backdrop that, when combined with other circumstantial evidence of bias in [a plaintiff's] specific proceeding, gives rise to a plausible claim." *See, e.g., Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018). In the record before the District Court, it was undisputed that UNM was under heavy pressure from both the public, the media and DOJ to more aggressively investigate and discipline alleged sexual assault. *See* discussion *supra* at 5-8.

The external pressure on UNM in this particular case is significantly stronger than most others because here, DOJ not only investigated UNM but found UNM to have violated Title IX by failing to adequately investigate and discipline sexual assault. *See* DOJ Findings (App.Vol.3 623-659); discussion *supra* at 6-7. UNM then entered into a settlement agreement with DOJ under which UNM was subject to DOJ supervision and monitoring of its handling of sexual assault complaints during that the same time that UNM investigated and disciplined Plaintiff. *See* DOJ Agreement (App.Vol.3, 683-701); discussion *supra* at 7-8.

"It is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault." *Doe v. Columbia*, the court concluded that given the University administration's cognizance and sensitivity of similar criticisms. 831 F.3d 46, 57 (2nd Cir. 2016).

While evidence of external pressure is relevant to and can support a Title IX claim, Plaintiff acknowledges that external pressure "alone is not enough to [prove] that the university acted with bias in a particular case." *Doe v. Coastal Carolina Univ.*, 522 F. Supp. 3d 173, 179 (D.S.C. 2021) (quoting *Baum*, 903 F.3d at 586). That said, the uncontroverted and undisputed external pressure on UNM should carry more weight here because Complainant made the Report to UNM only days after UNM entered into the DOJ Agreement.

2. *Statistical Evidence of Gender Biased Patterns in UNM Decision-Making.*

In *Doe I*, this Court held that generalized evidence of pressure, standing alone, could not satisfy a Title IX plaintiff's summary judgment burden "unless combined with a particularized something more ... that would indicate that [the University's] decision in his particular case was based on his gender." 952 F.3d at 1192–93. In *Doe II*, this Court held that "statistical sex disparity in the University's resolution of

[sexual assault] complaints [that suggests anti-male bias could be influencing outcomes. . . is the 'something more' that *Doe I* suggests." *Doe II*, 1 F.4th at 835.

In *Doe II*, this Court held that a Title IX plaintiff can demonstrate gender bias by statistical disparity in the gender make up of a university's sexual misconduct investigations, findings, and discipline. As described in detail above, *supra* at 8-10, statistical analysis of the UNM Files ordered to be produced by the District Court prove that UNM investigated, found against, and disciplined male respondents at significantly higher rates than female respondents during the time period that UNM investigated and disciplined Plaintiff. This Court found that statistical evidence of discrimination like that submitted here, supports both a prima facie inference of discrimination and supports a claim of pretext.

3.  *Evidence of Procedural Irregularities in UNM's Proceeding Against Plaintiff Supports Inference of Sex Discrimination*

In *Doe II*, this Court held that "procedural deficiencies in [a Title IX plaintiff's] sexual-assault investigation, combined with additional statistical evidence of sex bias," are sufficient to survive summary judgment. that procedural irregularities in the investigation and discipline of a Title IX plaintiff can support an inference of gender bias. 1 F.4th at 831 ("procedural deficiencies in [a university's] sexual-assault investigation, combined with additional statistical evidence of sex bias" was sufficient to survived summary judgment). This Court found that evidence

of procedural irregularities support both a prima facie inference of sex-based discrimination and supports a claim of pretext.

In *Doe II,* the Tenth Circuit held, *inter alia*, held that the University's decisions to ignore inconsistencies in the accuser's account, disregard John Doe's witnesses and favor the accuser's witnesses, and omit or downplay exculpatory evidence raised a plausible inference that the University discriminated on the basis of sex. 1 F.4th at 831-32 (reversing grant of summary judgment by district court). "Adopt[ion] of Complainant's statements as true, 'even though the statements were illogical, inconsistent, or contrary to other witnesses,' and decision to ignore 'all evidence exculpatory to plaintiff supports an inference of gender bias.'" *Id*.

As detailed above, *supra* at 19-24, UNM's one-sided investigation is similarly "replete with procedural deficiencies that all disfavor Plaintiff and favor Complainant, despite substantial reasons to discount her allegations." *Id*.

Additionally, the UNM investigator's finding that the sexual activity between Plaintiff and Complainant was "unwelcome" ignored all inconsistencies in Complainant's account, including her Ex-Husband's admission that Complainant threatened to kiss Mr. Briggs that very day. In addition to wrongfully failing to consider this statement as evidence that Complainant may have welcomed sexual contact with Plaintiff, UNM also failed to consider this statement as relevant to Complainant's credibility. UNM should have noted that it was her Ex-Husband, not

Complainant, who revealed Complainant's threat to kiss Plaintiff. Further, given that APD considered the text messages between Complainant and her Ex-Husband to be exculpatory evidence, it was incumbent upon UNM to explain why or how it found it so easy to completely disregard both the fact of Complainant's very specific threat to kiss Plaintiff and the impact upon her credibility in failing to provide any information about this threat to UNM, and then deleting these text message communications from her phone. UNM's election to ignore potentially exculpatory both raises a plausible inference that UNM discriminated against Plaintiff because of his gender and is evidence of pretext.

UNM also failed to give any weight to the fact that it was Complainant, not Plaintiff, who initiated meeting on the day of the sexual activity. UNM's investigator did not consider it "flirting" when Complainant texted Plaintiff a picture of her husband being kissed in his play and made it clear she wanted to meet Plaintiff for drinks. UNM's investigator apparently considered it irrelevant that even by Complainant's own account, it was Complainant who brought up the idea of going to and meeting at Plaintiff's home. (App.Vol.2, 410). The fact that Complainant, again by her own admission, also offered to pick up beers on her way to meet Plaintiff at his home was similarly discounted by UNM's investigator. (App.Vol.3, 719) It was also apparently irrelevant to UNM's investigator that Complainant failed to disclose that she brought beer to Plaintiff's home. (App.Vol.2, 410).

In Plaintiff's police interview, APD asked Plaintiff whether his interactions with Complainant at his home was "ever flirtatious in nature." (App.Vol.3, 732) Plaintiff responded, stating, "You know, I felt—she was up on the couch with her shoes off, and you know, her feet kind of toward me, and I was kind of—I was close with her." (App.Vol.3, 732) Detective Spinks offered, "just reading the writing on the wall, she's complaining about her husband, she's texted you the struggle of him kissing another girl, it's obviously a sore spot for her. Now you guys are alone at your house, there's alcohol involved. I mean, it seems flirtatious to me." (*Id.*). UNM's investigator completely ignored this evidence and relied entirely on Complainant "den[ying] having any sexual interest in [Plaintiff]." (App.Vol.2, 426). UNM's investigator ignored evidence that contradicted Complainant's version of events, including the fact that Complainant had told at least one other person that she found Plaintiff attractive. (App.Vol.2, 426).

UNM also rejected Plaintiff' statement as to what happened in the shower, while accepting Ms. VanMeter's statement in its entirety, despite her credibility issues identified above. Plaintiff told UNM that when he kissed Complainant in the shower, she kissed him back. (App.Vol.2, 427). UNM also rejected Plaintiff's statement that Complainant never exhibited any signs of intoxication, lack of capacity, lack of balance, or inability to speak, nor did she express that she was having any such difficulties.

45

UNM's Investigator rejected Plaintiff's version of events entirely, while making credibility assessments on the archaic assumption that Complainant would not have engaged in sexual activity with Plaintiff because she was a mother. Both Plaintiff and Complainant are parents, yet only Complainant's status as a mother was considered in UNM's credibility analysis. Specifically, UNM's investigator concluded that "the evidence shows more likely than not Complainant was unlikely to consume more alcohol than would allow her to safely drive home or knowingly engage in any conduct that would prevent her from being able to take care of her child." (App.Vol.2, 431) Completely absent from this analysis is any comparable reference to the fact that Plaintiff is a father, described in equally glowing terms by his ex-wife as "mellow, kind, loving, level-headed, and an amazing father." (App.Vol.3, 711-712).

Plaintiff was summarily determined to be "not credible." UNM interpreted evidence, made credibility determinations, and manufactured unreasonable inferences to support only that result. Inconsistencies in witnesses' statements, including the Complainant's, were also never analyzed, or followed up on. These allegations, when viewed in the light most favorable to Plaintiff, demonstrate that UNM accepted all evidence from Complainant as true and rejected all evidence that might support Plaintiff's version of events.

The fact that UNM failed to follow its own policies and procedures as it adjudicated his case also supports an inference that Defendants allowed gender bias to affect Plaintiff's disciplinary proceedings and termination. *See Lee v. UNM*, 449 F. Supp. 3d 1071 (noting that the plaintiff's factual allegations that UNM failed to follow its procedures indicated that UNM allowed gender bias to affect Lee's disciplinary proceedings) (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 56-57 (2d Cir. 2016) (identifying failing "to act in accordance with University procedures designed to protect accused students" as an allegation supporting the inference of sex discrimination). Dr. Larson's declaration describes at length how UNM engaged in a highly irregular disciplinary process against Plaintiff.

The undisputed fact that UNM destroyed the email account of its sole investigator in violation of its own policies, state law, and despite a preservation demand from Plaintiff also supports Plaintiff's Title IX claim. *See Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 402 (W.D. N.Y. Sept. 20, 2017) (motion to dismiss Title IX claim denied because, *inter alia*, university failed to review or preserve electronic evidence or conduct any follow-up interviews to resolve inconsistencies between witnesses' statements).

The UNM President's reversal on grounds that Plaintiff "might create a hostile work environment based on Plaintiff's 'potential negative influence in [Complainant's] work environment'" contradicts virtually all evidence in the record.

UNM's President cited no authority whatsoever for this extraordinary position. Controlling federal law is the opposite. *Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016). ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice .... it takes place over time, and in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."). There was no evidence whatsoever that Plaintiff had engaged in series of acts to create a hostile work environment for Complainant, nor could he at that point because she no longer worked at UNM. A jury could reasonably find that the UNM President's reversal of UNM's finding of "No Policy Violation" was a pretext for his termination.

Dr. Larson's Declaration similarly provides extensive detail about UNM's highly irregular investigation and discipline of Plaintiff. "[D]isturbing procedural irregularities surrounding an adverse employment action may demonstrate that an employer's proffered nondiscriminatory business reason is pretextual." *Doe II*, 1 F.4th at 832 (quoting *Timmerman*, 483 F.3d at 1122). "Such irregularities can be sufficient to call into question the [University]'s honesty and good faith in making the [disciplinary] decision and, consequently, establish pretext." *Bird*, 832 F.3d at 1203 (discussing procedural irregularities in the context of adverse employment actions).

"[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding despite the Regents' protests otherwise." *Doe v. Regents of Univ. of California*, 23 F.4th 930, 941 (9th Cir. 2022). "Taken together, Doe's allegations of external pressures and an internal pattern and practice of bias, along with allegations concerning his particular disciplinary case, give rise to a plausible inference that the University discriminated against Doe on the basis of sex." *Id.*

"[A]t the summary judgment stage, 'if a plaintiff advances evidence establishing a prima facie case and evidence upon which a factfinder could conclude that the defendant's alleged nondiscriminatory reasons for the employment decisions are pretextual, the case should go to the factfinder." *Mirzai v. State of New Mexico Gen. Servs. Dep't*, 506 F. Supp. 2d 767, 776 (D.N.M. 2007).

B.     The District Court Erred by Striking Dr. Larson Declaration

At all material times, Dr. Richard Larson served as the Executive Vice Chancellor for UNMHSC – the second highest position in that organization. Declaration of Dr. Richard Larson (the "Larson Decl.") at ¶ 1 (App.Vol.4, 576). Dr. Larson worked at UNMHSC for 26 years and with Plaintiff for approximately twelve (12) years. (*Id.,* 577-578) ("I found Mr. Briggs's work to be outstanding and exceptional. Mr. Briggs was an exemplary employee and received only positive performance evaluations."). As Plaintiff supervisor, Dr. Larson was initially

designated by UNM to discipline him after UNM's President reversed OEO's initial finding of "No Policy Violation." (*Id.*, 579).

In opposition to UNM's summary judgment motion, Plaintiff submitted an extensive declaration from Dr. Larson describing in great factual detail serious procedural deficiencies and irregularities in UNM's investigation, discipline, and ultimate termination of Plaintiff ("Dr. Larson's Declaration"). (App.Vol.3, 576-601). Dr. Larson's Declaration details the pressure put on him to terminate Plaintiff's employment by UNM's female administrators and explains his ultimate decision to recuse himself from the process. (*Id.* at 579-586). Dr. Larson's uncontroverted declaration is relevant to Plaintiff's argument that UNM's investigation and discipline suffered from procedural deficiencies and irregularities. *Doe II*, 1 F.4th 822, 829–30 (10th Cir. 2021) (reversing grant of summary judgment because "procedural deficiencies in [a] sexual-assault investigation, combined with additional statistical evidence of sex bias," are sufficient to show an inference of sex discrimination under Title IX)); *see also Doe v. Oberlin Coll.*, 963 F.3d 580, 587 (6th Cir. 2020) ("Procedural irregularities provide strong support for Doe's claim of bias here.").

Dr. Larson's Declaration also explains how he contemporaneously documented UNM's highly irregular discipline of Plaintiff "(a) in the event that I or another administrator at UNMHSC was sued for wrongful termination by Mr.

Briggs; (b) because I felt pressured to terminate Mr. Briggs; and (c) because I was increasingly concerned that the disciplinary process for Mr. Briggs was irregular and biased." (*Id.* at 581-582). Dr. Larson details how he sent contemporaneous emails to his personal email account documenting his concerns, emails which were then deleted by UNM. (*Id.* at 583). Dr. Larson states that he was told by Defendant Paul Roth that (a) that UNM's female executives were insistent that Plaintiff be terminated; and (b) a female executive involved in Plaintiff's discipline told Dr. Roth that she wanted to "cut Michael's dick off." (*Id.*, 581). Plaintiff respectfully requests that the Court read the entirety of Dr. Larson's Declaration because the District Court both struck and disregarded it in granting summary judgment against the non-movant here.

UNM argued, *inter alia*, that Dr. Larson's Declaration was a "sham affidavit" that contradicted his prior testimony. That argument should have failed for several reasons. First, comparison of Dr. Larson's Declaration to his prior testimony demonstrates that most points in the Declaration were never discussed at all during his limited testimony. (App.4 895-942). Second, Dr. Larson was disclosed by Plaintiff as a witness, but UNM did not depose him, or cross-examine him, or make any attempt at all to discover testimony that Dr. Larson might offer at trial in this case. Third, Dr. Larson's Declaration does not simply make unsupported assertions – it attaches contemporaneous emails confirming his sworn statements. (*Id.*, 588-

597) ("I am very concerned that OEO has additional motivations than properly documenting in writing the determinations of policy violations against Mr. Briggs."). Fourth, UNM and the District Court primarily relied on Dr. Larson's answer to a leading question in which he was asked to *confirm the attorney's summary* about whether he raised certain "concerns" at a particular meeting. (App.Vol.3, 514) ("I think [your leading question]'s a misinterpretation of my concern."). Dr. Larson was not denying he had concerns. (*Id.*) ("I did express a concern."). Nor was Dr. Larson denying any of the statements made in his Declaration – he was only questioning whether the attorney accurately characterized a concern he raised at a particular meeting. (*Id.* 514).

Importantly, nowhere did Dr. Larson testify that he thought that the investigation and discipline of Plaintiff was fair and unbiased. Instead, it is undisputed that Dr. Larson recused himself from the process after UNM's Title IX Coordinator "said that my action implied that I was acting as a judicial advocate for Mr. Briggs." (*Id.*, 902).

But even if Dr. Larson's expansion on his prior testimony could be considered a change in testimony (it is not), that should be a matter for cross-examination at trial, and go to the weight of his testimony, not its admissibility. "Contradictions in a witness's testimony do not, without more, justify preclusion of that testimony." *King v. Est. of Gilbreath*, 215 F. Supp. 3d 1149, 1160 (D.N.M. 2016) (citing *Ralston*

*v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001). A subsequent affidavit "'may not be disregarded [merely] because it conflicts with the affiant's prior sworn statements.'" *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). The District Court erred in striking some or all of Dr. Larson's Declaration.

Notably, the District Court indicated that it was only striking portions of Dr. Larson's Declaration that contradicted his prior testimony. But the District Court did not identify which portions of Dr. Larson's Declaration that it was excluding, and appears to have largely disregarded Dr. Larson's *uncontroverted* testimony. By striking Dr. Larson's Declaration, the District Court improperly weighed evidence and effectively made its own credibility determination against a key witness who recused himself from the discipline in dispute. "It is axiomatic that a [District Court] may not evaluate the credibility of witnesses in deciding a motion for summary judgment." *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000). The District Court "may not grant summary judgment based on its own perception that one witness is more credible than another; these determinations must be left for the jury." *Fogarty v. Gallegos*, 523 F.3d 1147, 1165–66 (10th Cir. 2008) (citing *Anderson,* 477 U.S. at 255).

## III. The District Court Erred by Granting Summary Judgment Against Plaintiff's Title VII, NMHRA and Related Claims

The District Court granted summary judgment against Plaintiff's Title VII and NMHRA claims, as well as Plaintiff's claims for injunctive relief and declaratory judgment for the same reasons that the District Court granted summary judgment against Plaintiff's Title IX claims. The Court should reverse summary judgment against those claims for all the reasons stated above.

## IV. The District Court Erred by Dismissing Plaintiff's Breach of Implied Contract Claim (Count VI)

New Mexico law holds that "a promise, or offer, that supports an implied contract might be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct." *Lee v. Univ. of N.M.*, 449 F. Supp. 3d 1071, 1120-21 (D.N.M. 2020) (citing *Newberry v. Allied Stores, Inc.*, 1989-NMSC-024, ¶¶ 6-7, 108 N.M. 424, 773 P.2d 1231, 1233). "Whether an implied employment contract exists is a question of fact, and it may be found in written representations such as an employee handbook." *Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶¶9-20, 121 N.M. 728, 731-35, 918 P.2d 7, 10-14 ("[W]e hold that this implied employment contract, which includes a written personnel policy, constitutes a "valid written contract" required to waive governmental immunity under Section

37–1–23(A).”); *see also Lee*, 449 F. Supp. 3d at 1120-21 (summarizing state law and explaining that whether personnel policies create an implied employment contract is "generally is a question of fact for the jury.").

Pursuant to Rule 12(b)(6), UNM moved to dismiss Plaintiff's claim for breach of implied contract (Count VI) in a filing confusingly titled "Motion to Dismiss Plaintiff's Claims [Under] the Tort Claims Act (Counts IV-IX)." (App.Vol.1 at 70-88). But Plaintiff's claim is not a tort, nor is it subject to the NMTCA, nor did Defendants argue such.

Despite the motion's title, UNM argued instead that, under a different statute, N.M.S.A. § 37-1-23(A), "[g]overnmental entities are granted immunity from actions based on contract, except actions based on a valid written contract." (App.Vol.1 at 82-85). But the New Mexico Supreme Court has expressly held that employment policies of governmental entities like UNM are "written" and therefore satisfy NMSA § 37-1-23(A). *Garcia*, 1996-NMSC-029, ¶ 14, 918 P.2d at 11 ("Next, we address whether Section 37-1-23(A), which waives governmental immunity in cases involving valid written contracts, incorporates an implied employment contract that includes written terms as set forth in a personnel policy. We hold that it does.").

> We conclude that the Personnel Policy comprehensively controls the employer-employee relationship in the MRGCD and that it creates a reasonable expectation for MRGCD employees that the MRGCD will follow the provisions contained within Personnel Policy. Thus, we hold that the Personnel Policy constitutes an implied employment contract.

Additionally, we recognize the legitimate policy goals in waiving governmental immunity in cases involving valid written contracts. On the facts of this case, and in view of the legitimate policy goals outlined above, we hold that this implied employment contract, which includes a written personnel policy, constitutes a "valid written contract" required to waive governmental immunity under Section 37-1-23(A).

*Id*, 918 P.2d at 13.

The District Court held a hearing on August 24, 2021, during which UNM admitted that the implied contract claim was not a tort or subject to the NMTCA. (App.Vol.2, 296-98) ("it is possible, admittedly, that policies and procedures that have been promulgated can form a basis. Typically, it's a question of fact.").  The District Court deferred ruling and took the motion under consideration (*Id.* at 230).

On September 22, 2021, the District Court entered an Order dismissing Briggs' breach of implied employment contract claim but did not address NMSA § 37-1-23(A) or the *Garcia* holding.  (App.Vol.1, 237-39).  Instead, the District Court grouped Plaintiff's implied contract claim with Plaintiff tort claims that were subject to the NMTCA, and broadly dismissed all claims included in that motion after finding that two waivers under the NMTCA did not apply.  (*Id.*) The District Court indicated that it would "issue at a later date, however, a Memorandum Opinion more fully detailing its rationale for this decision." (*Id.* at 232, n.1).  This cause was later transferred to a different Article III judge who ruled that no further order would be issued (App.Vol.2, 336-37).

The District Court erred by dismissing Plaintiff's breach of implied contract claim under Rule 12(b)(6) because (1) that claim is not a tort claim nor subject to the NMTCA; (2) a personnel policy is a written contract for purposes of NMSA § 37-1-23(A); and (3) the New Mexico Supreme Court recognized in *Garcia* that a governmental entity's employment policies can form an enforceable implied employment contract.

## CONCLUSION

Plaintiff-Appellant Michael Briggs respectfully submits that this Court should: (i) reverse the District Court's order granting summary judgment in all respects; (ii) reverse the District Court's earlier order dismissing Plaintiff's state law claim for Breach of Implied Contract under Rule 12(b)(6); (iii) remand this case back to the District Court for further proceedings consistent with the above relief, and (iv) grant such other and further relief as the Court deems just and proper.

## STATEMENT REGARDING ORAL ARGUMENT

In light of the complexity of the case and the novelty of the specific issues presented here, Plaintiff-Appellant respectfully requests oral argument.

Dated: October 28, 2025

<div style="margin-left:40%">

Respectfully Submitted

/s/Travis G. Jackson

Travis G. Jackson

Sarah K. Downey

Jackson Loman Downey & Stevens-Block, P.C.

201 3rd Street, Suite 1500

Albuquerque, New Mexico 87102

Telephone (505) 767-0577

travis@jacksonlomanlaw.com

sarah@jacksonlomanlaw.com

Attorneys for Plaintiff-Appellant Michael Briggs

</div>

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.      Appellant's Opening Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), Appellant's Opening Brief contains 12,796 words.

2.      Appellant's Opening Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 point Times New Roman.
        .

Date: October 28, 2025.


                        /s/Travis G. Jackson
                        Travis G. Jackson
                        Jackson Loman Downey & Stevens-Block, P.C.
                        201 3rd Street, Suite 1500
                        Albuquerque, New Mexico 87102
                        Telephone (505) 767-0577
                        travis@jacksonlomanlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2025, I electronically filed the foregoing APPELLANT'S OPENING BRIEF with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served via the Tenth Circuit CM/ECF on all counsel of record for the parties in this case.

s/Travis G. Jackson

# CASE NO. 25-2068

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

MICHAEL BRIGGS,

      Plaintiff-Appellant,

v.

THE UNIVERSITY OF NEW MEXICO, a public university, THE BOARD
OF REGENTS OF THE UNIVERSITY OF NEW MEXICO, GARNETT
STOKES, individually and in her official capacity, PAUL B. ROTH,
individually and in his official capacity, DOROTHY ANDERSON,
individually and in her official capacity, LAURA VELE BUCHS,
individually and in her official capacity, and KEVIN GICK, individually and
in his official capacity,

      Defendants-Appellees.

---

On Appeal from the United States District Court
For the District of New Mexico
The Honorable Kea W. Riggs
District Court Case No. 20-cv-00651 KWR-JMR

---

## ATTACHMENT 1 TO APPELLANT'S OPENING BRIEF
### District Court Memorandum Opinion and Order
### Filed May 23, 2025 [Doc. No. 172]

Travis G. Jackson
Jackson Loman Downey & Stevens-Block, P.C.
201 3rd St. NW, Suite 1500
Albuquerque, New Mexico 87102
Telephone (505) 767-0577
travis@jacksonlomanlaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____

MICHAEL BRIGGS,

      Plaintiff,

    vs.                                     1:20-cv-00651 KWR/JMR

UNIVERSITY OF NEW MEXICO,
UNIVERSITY OF NEW MEXICO BOARD
OF REGENTS, GARNETT STOKES,
PAUL B. ROTH, DOROTHY ANDERSON,
LAURA VELE BUCHS, KEVIN GICK,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

THIS MATTER comes before the Court upon the following motions:

- UNM Defendants'[1] Motion to Dismiss and for Summary Judgment (Doc. 129);

- UNM Defendants' Motion to Strike Plaintiff's Summary Judgment Evidence (Doc. 146); and

- Plaintiff's Opposed Motion for Leave to Identify Statistical Expert (Doc. 154).

This employment case stems from Plaintiff's termination from the University of New Mexico after he allegedly sexually assaulted a coworker, Joy Van Meter.[2] Plaintiff asserts that

---

[1] The University of New Mexico ("UNM") Defendants include Defendants the University of New Mexico, the Board of Regents of the University of New Mexico ("BORUNM"), Garnett Stokes, Paul B. Roth, Dorothy Anderson, Laura Vele Buchs, and Kevin Gick.

[2] The parties name Mr. Briggs and Ms. Van Meter without using pseudonyms, and Mr. Briggs and Ms. Joy Van Meter proceed without anonymity. *See, e.g., Vanmeter v. Briggs, et al.,* 1:18-cv-970 (D.N.M.). The Court will therefore do the same and will not use pseudonyms to refer to Mr. Briggs and Ms. Van Meter. Ms. Van Meter is also alternatively referred to in the record as "Ms. Vanmeter." However, the parties in this case refer to her as "Ms. Van Meter", and the Court will do the same. *See, e.g.,* Docs. 129, 148.

his termination in this case was motivated by his sex and therefore violated Title IX, Title VII, and the New Mexico Human Rights Act. Defendants seek summary judgment or dismissal as to the remaining claims in this case, including the Title IX claim, the Title VII claim, the New Mexico Human Rights Act claim, and the requests for injunctive and declaratory relief.

Having reviewed the record and the relevant law, the Court finds that Defendants' Motion to Dismiss and for Summary Judgment (Doc. 129) is well taken and therefore is **GRANTED**. As explained below, Plaintiff has failed to create a genuine dispute of material fact that his sex was a motivating factor in the adverse employment actions. Defendants' Motion to Strike Plaintiff's Summary Judgment Evidence (Doc. 146) is **GRANTED IN PART** and **DENIED IN PART**. Finally, Plaintiff's Motion for Leave to Identify Statistical Expert (Doc. 154) is **DENIED** as moot.

## BACKGROUND

Plaintiff challenges the termination of his employment at UNM. UNM terminated his employment because, after several administrative proceedings, it concluded that he created a hostile work environment by sexually assaulting a coworker, Joy Van Meter.  Plaintiff asserted the following claims in his Complaint:

Count I: Due Process Violation

Count II: Violation of Title IX, 20 U.S.C. § 1681

Count III: Discrimination in Violation of Title VII of the Civil Rights Act of 1964 and

New Mexico Human Rights Act

Count IV: Defamation

Count V: Tortious Interference with Employment/Prospective Business

Count VI: Breach of Implied Employment Contract

Count VII: Breach of Covenant of Good Faith and Fair Dealing

Count VIII: Negligent Hiring/Investigation

Count IX: Spoliation of Evidence

Count X: Request for Injunctive Relief

Count XI: Request for Declaratory Relief: 28 U.S.C. § 2201 and NMSA 1978 § 44-6-1

*See* Complaint, Doc. 1.

The Hon. James O. Browning issued an order dismissing most of the claims in this case on September 22, 2021. In that Order, Judge Browning:

- dismissed the due process claim under Count I;

- dismissed the Title IX claim against the individual Defendants under Count II. The Title IX claim against UNM and UNM Board of Regents remained;

- dismissed the New Mexico Tort Claims Act claims under Counts IV-IX; and

- dismissed the New Mexico Human Rights Act claim under Count III as to Defendant Gick.

Thus, the following claims remain and are at issue in this opinion:

- a Title IX claim (Count II) against UNM and the Board of Regents of the University of New Mexico;

- a Title VII claim against all Defendants, and a New Mexico Human Rights Act claim against all Defendants except Gick, under Count III;

- and requests for injunctive and declaratory relief under Counts X and XI.

## FACTS

### I.    <u>Alleged Sexual Assault</u>.

Joy Van Meter, a coworker of Plaintiff Michael Briggs at the University of New Mexico, alleged that Plaintiff sexually assaulted her on October 14, 2016 during an off-campus social encounter. Mot. Summ. J., Doc. 129 at 4, ¶ 1.

Ms. Van Meter alleged that she and Plaintiff met at a bar, consumed alcohol, went to Plaintiff's house and consumed more alcohol before she became nauseated and dizzy, vomited several times, had balance and processing issues, and became confused. She alleged Plaintiff encouraged her to shower, disrobed her, entered the shower with her, and engaged in sexual activity, including oral sex and digital penetration. Doc. 129 at 4, ¶ 2, *citing* Preliminary Letter of Determination ("PLOD"), Doc. 129-2, at 3-5.[3] She alleged these acts were not consensual.

Plaintiff and Ms. Van Meter had known each other for over two years prior to this incident, and initially met while participating in UNM's Executive MBA program from which both had already graduated earlier that year. Pl.'s Resp., Doc. 148 at 12, ¶ r. At the time of the alleged sexual assault, they both worked at UNM.

On October 14, 2016, the two met at a restaurant. Doc. 148 at 13, ¶ s. Prior to this meeting, Ms. Van Meter and her husband argued because he kissed an actress while performing in a theater play. Doc. 148 at 13, ¶ t. The kiss was displayed on promotional material across campus. Her husband told officers that during the argument she said in a text message "something like, how would you - - how would you like it if I kissed Mr. Briggs?" Doc. 148 at 14, ¶ v. Defendants considered the argument and questioned Ms. Van Meter's husband about it as part of its investigation. Doc. 129-2 at 13-14. Both Ms. Van Meter and her husband deleted the text messages. Doc. 148 at 16, ¶ z.

---

[3] When citing to page numbers, the Court generally refers to the page numbers generated by CM/ECF at the top of the page, except where the Court cites to deposition page and line numbers.

While meeting with Plaintiff for drinks at the restaurant, Ms. Van Meter asked when she could see Plaintiff's new home, and they decided to drive separately to his home. Doc. 148 at 16, ¶ aa. At his home they talked for several hours and had two more beers. Doc. 148 at 16, ¶ bb.

Plaintiff admitted to UNM investigators that at some point Ms. Van Meter told him she had vomited in the bathroom. Doc. 148 at 16, ¶ cc, *citing* Doc. 149, Ex. 22 at 205. Plaintiff asserts he offered to let her use his shower to clean vomit from her hair. Doc. 148 at 16, ¶ cc. Plaintiff asserts that she undressed in front of him, and he asked if he could join her in the shower; he alleges she indicated yes. *Id.*

However, Ms. Van Meter told the Albuquerque Police Department, which the Defendants considered in their investigation, as follows. She asserted that she vomited at least six times and that Plaintiff took off her clothes while she was incapacitated. Doc. 157 at 20, *citing* Doc. 149 at 138-39. She denied that she invited Plaintiff into the shower with her. She stated that Plaintiff was staring at her while she was showering and joined her in the shower without her affirmative acquiescence. *Id.*[4]

Plaintiff asserts that he kissed Ms. Van Meter in the shower, and she reciprocated. Doc. 148 at 17, ¶ dd. However, she told police that she never reacted when Plaintiff kissed her. APD Police Report, Doc. 149 at 138-39. Ms. Van Meter reported to police that Plaintiff forced oral sex on her, and that she felt Plaintiff's "fingers being forced into her vagina." Doc. 149, Exhibit 16 at 139-40. Ms. Van Meter's statement was confirmed by a Sexual Assault Nurse Examiner ("SANE") report considered by Defendants, which noted bruises on her legs and genital abrasions and tears. PLOD, Doc. 129-2 at 5 (reflecting Defendants considered the SANE report,

---

[4] There is some discussion in the record regarding how Ms. Van Meter became intoxicated after drinking approximately three to four beers. She stated that she last ate at 7:00 a.m. Moreover, there were prescription benzodiazepines in her system. She was not tested for GHB, therefore it was not ruled out whether she was drugged. Doc. 149 at 147-48.

which noted three distinct injuries consistent with the use of a finger); Doc. 149 at 140 (police report noting bruises, tears, and abrasions).  Plaintiff admitted that Ms. Van Meter did not react at all, positively or negatively to oral sex. Doc. 149 at 146.

Ms. Van Meter told Plaintiff that she had to be home by 6:00 p.m., and the two got dressed.  Doc. 148 at 17, ¶ ee.  The police report reflects that Ms. Van Meter remembered sitting on Plaintiff's bed in her underwear after showering, but she did not remember how she ended up on his bed. Doc. 149 at 140.  She also asserts that she told Plaintiff to contact her husband and to tell him she was too drunk to drive home.  *Id*.  She tried to text her husband to pick her up, but she texted the wrong person, a friend in Maine. *Id*. Ms. Van Meter told police that Plaintiff eventually agreed to drive her home in her vehicle. *Id.* Plaintiff asserts that Ms. Van Meter asked him to drive her home. He drove Ms. Van Meter home in her car, where her husband was waiting outside.  Doc. 148 at 17, ¶ ff.

When she got home, Ms. Van Meter's husband went to work and took their child with him. Her husband said she "was in no condition" to watch their daughter upon arriving home. Doc. 129-2 at 24. Ms. Van Meter and her husband did not talk about what happened until the morning of Saturday, October 15, 2016.  Doc. 148 at 17, ¶ hh.

She deleted all of the texts she exchanged with her husband the day after the alleged assault.  Doc. 148 at 18, ¶ ii.  She also deleted all of her text messages with Plaintiff.  *Id.* at ¶ ii-kk. However, some text messages between Ms. Van Meter and Plaintiff were recovered, and text messages between Ms. Van Meter and a friend were recovered and considered by Defendants. Doc. 129-2 at 17 (listing documentary evidence considered).

Ms. Van Meter went on Sunday, October 16, 2016 to a clinic at UNM for a SANE examination. Doc. 129-2 at 15. DNA tests were negative.  Doc. 148 at 18, ¶ ll. Drug tests were

6

positive for diazepam and its metabolites, for which Ms. Van Meter has a prescription. Doc. 149 at 147. They did not test for GHB because of a time delay. *Id.* APD investigated the alleged sexual assault but have not charged Plaintiff with a crime. Doc. 148 at 18, ¶ mm.

## II.    <u>DOJ investigation and alleged outside pressure</u>.

Between 2014 and 2018, there were multiple media reports criticizing UNM's handling of sexual assaults. Doc. 148 at 9, ¶ g.

In December 2014, the United States Department of Justice ("DOJ") initiated an investigation of UNM "after receiving complaints from multiple students alleging that UNM did not respond adequately to their reports of sexual assault." Doc. 148 at 9, ¶ h, *quoting* DOJ Letter of Findings, Doc. 149, Ex. 6. In order to comply with Title IX and not lose federal funding, DOJ asserted that UNM must promptly take measures, including to (1) "[r]evise the University's policies, procedures, and investigative practices to provide a grievance procedure that ensures prompt and equitable resolution of sexual harassment and sexual assault allegations"; (2) "[a]dequately investigate or respond to all allegations by students who have alleged sexual harassment, including sexual assault"; and (3) "[t]ake prompt and effective steps to eliminate a hostile environment, prevent its recurrence, and address its effects." Doc. 148 at 11, ¶ j, *citing* DOJ Letter, Doc. 149, Ex. 6. at 89.

In July 2016, UNM's then-President Bob Frank authored an opinion article in the Albuquerque Journal titled "UNM serious about sexual assault issue," and stated: "[s]exual assault is arguably the most disturbing issue on our college campuses nationwide. At UNM, it has become a primary focus over the past few years" and "we are moving aggressively ahead with major changes in our campus wide response." Doc. 148 at 11, ¶ k.

On October 17, 2016, UNM entered into an agreement with the DOJ that required, *inter alia*, that (1) UNM "make all necessary and appropriate revisions to its policies, procedures, and practices regarding campus sexual harassment, including sexual violence;" and (2) "[i]n return, DOJ will not initiate litigation regarding its Title IX and Title IV findings…." Doc. 148 at 11, ¶ l.

The DOJ Agreement required that UNM remain under federal supervision for three (3) years, during which time DOJ would monitor UNM's investigation of reports of sexual assault, and UNM was required to report "[d]etailed data on the number of sexual harassment reports received by the University, whether the University investigated each report, and, if investigated, the findings, [and] the sanctions imposed (if applicable) . . . ." Doc. 148 at 11-12, ¶ m.

The DOJ Agreement provided that: "[i]f the Department determines that the University has failed to comply with the terms of this Agreement or has failed to comply in a timely manner with any requirement of this Agreement, . . . the Department may initiate civil enforcement proceedings in federal court." Doc. 148 at 12, ¶ n.  UNM was ultimately released from the agreement and no civil enforcement proceeding was filed.

After UNM signed the DOJ agreement, Ms. Van Meter reported to UNM that Plaintiff had sexually assaulted her.  Doc. 148 at 12, ¶ o.

### III.    Office of Equal Opportunity investigation and issuance of its Preliminary and Final Letters of Determination.

Ms. Van Meter reported the alleged sexual assault to UNM's Office of Equal Opportunity ("OEO"), which investigated the allegations.  Doc. 129 at ¶ 3.  Ms. Vele Buchs was assigned as an investigator.  *Id.* at ¶4. The investigation included obtaining and analyzing Ms. Van Meter's statement, Plaintiff's statement, the statements of seven other witnesses, text messages, a SANE

Report, an Albuquerque Police Department report, and other evidence. *Id.* at 4, ¶ 5, *citing* Doc. 129-2 at 2, 5, 8, 17.

Plaintiff does not dispute that sexual activity occurred. However, he asserts the sexual activity was consensual. Doc. 129 at 5, ¶ 6. The OEO noted that Plaintiff admitted to the following factual allegations: (a) he initiated the sexual conduct; (b) Ms. Van Metter was not touching him in a sexual manner; (c) Ms. Van Meter never indicated that she was enjoying he sexual activity; (d) she never stated that she wanted to have sex with Plaintiff; and (e) Plaintiff drove Ms. Van Meter home, because she had been drinking. Doc. 129 at 5, ¶ 7, *citing* Doc. 129-2 at 7, 19, 20.

According to UNM's Policy 2720 at § 2.2, harassment includes behaviors that "are sufficiently severe or pervasive to have the effect of unreasonably interfering with [a person's] … working conditions … by creating an intimidating, hostile, or offensive environment." Doc. 129 at 5, ¶ 8. UNM's Policy 2740, § 3 states that "[s]exual activity will be considered 'without consent' if no clear act or statement is given. Consent may not be inferred from silence, passivity or lack of active response alone." Doc. 129 at 5, ¶ 9. UNM's Policy 2730, § 2.2 includes rape, sexual assault, and sexual coercion as examples of sexual harassment. Doc. 129 at 5, ¶ 10. The record reflects that these policies were in effect at the time of the alleged sexual assault. Decl. of Francie Cordova, Doc. 129-1 at ¶ 6-8.

On December 4, 2017, the OEO issued a 28-page Preliminary Letter of Determination ("PLOD")[5] setting forth their findings and recommended disposition of the action, with an

---

[5] Plaintiff asserts that the Court may not consider statements in various reports produced in the disciplinary proceeding, including the PLOD, as they are hearsay. The Court disagrees, as the statements are not being considered for the truth of the matter asserted, or whether Plaintiff in fact sexually assaulted Ms. Van Meter. At issue here is UNM's employment decision and whether it appropriately investigated the alleged assault. The statements are offered to show the

opportunity to object. It concluded that Plaintiff subjected Ms. Van Metter "to unwelcome activity" which "was severe in nature", without evidence that Plaintiff asked if Ms. Van Meter wanted to engage in the sexual activity reported and without evidence that she was enjoying the sexual activity. Doc. 129 at 6, ¶ 11, *citing* Doc. 129-2 at 20, 27.  The PLOD concluded that Plaintiff treated Ms. Van Meter's silence, passivity, and lack of response as consent in direct contravention of UNM's policy. Doc. 129 at 6, ¶ 12.

Moreover, the PLOD concluded that Plaintiff lacked the capacity to consent. PLOD, Doc. 129-2 at 27*; see also* Panel Decision, Doc. 129-10 at 6 ("the Panel agrees with OEO's finding that … Complainant did not have the capacity to consent to sexual activity and that you knew or should have known that by the circumstances of the encounter."); Disciplinary Action Form, Doc. 129-9 at 1 (also noting that OEO found Ms. Van Meter lacked capacity to consent).

Despite the PLOD's conclusion that Plaintiff violated UNM's consent policy and that Ms. Van Meter lacked capacity to consent to sexual activity, the PLOD found that "there is no objective evidence of unreasonable interference in [the accuser's] work performance and/or environment."  Doc. 148 at 20, ¶ yy. The PLOD states that there was "No Policy Violation" because there was "not sufficient evidence to show more likely than not [that Mr. Briggs] subjected [Ms. Van Meter] to unwanted conduct of a sexual nature that unreasonably interfered

---

effect on the decision-makers' state of mind when they made the decision to terminate Plaintiff and to establish whether there are legitimate reasons for the termination.  *See Zamora v. Bd. of Educ. for Las Cruces Pub. Sch*., 553 F. App'x 786, 790 (10th Cir. 2014) (report was offered "to establish the effect it had on Superintendent Rounds' state of mind when he made the decision to terminate Zamora. In other words, the report was not offered to prove that Zamora did in fact sexually harass some employees or violate other policies; instead, the report was offered to demonstrate that Superintendent Rounds believed there were legitimate reasons for his decision to terminate Zamora's contract."); *see Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1434 (10th Cir. 1993) (holding that statements "offered to establish [defendant's] state of mind in making [an employment] decision[ ] and ... not offered for the truth of the matter asserted" are not hearsay).

with [her] work performance and work environment….” Doc. 148 at 21, ¶yy. The PLOD further states that while the sexual activity “had the subjective effective [sic] of creating a hostile work environment for [Ms. Van Meter],” there was no objective evidence of unreasonable interference with Ms. Van Meter’s work environment. PLOD, Doc. 129-2 at 27. 14. Accordingly, the OEO’s preliminary determination was that there was no violation of UNM’s employment policies by Plaintiff. *Id.* at 28.

Both parties were permitted to respond to the OEO’s preliminary determination. Ms. Van Meter submitted information in response to the PLOD, asserting that (1) Plaintiff was copied in emails, letters, and memoranda she received at work, which made her work life very difficult, and (2) the stipulated protection order excepted contact between the parties for incidental contact, implying there was a possibility that the parties would run into each other at work.  Doc. 129 at 6, ¶ 13. Plaintiff stipulated to the protection order, including language that if the parties found themselves within 25 feet of each other at work, it would not be deemed a violation of that order.  *Id.* at 6-7, ¶ 16.

On December 12, 2017, the OEO confirmed its preliminary determination in its Final Letter of Determination (“FLOD”) and gave both parties five (5) business days to appeal that decision. Doc. 148 at 21, ¶ zz.

Despite a litigation hold, UNM deleted the email account of Ms. Vele Buchs, the investigator, after she left her employment with UNM. Doc. 148 at 20, ¶ ww.  Dr. Larson, who was initially tasked with disciplining Mr. Briggs, also asserted that e-mails related to the disciplinary process were deleted.  Doc. 148 at 20, ¶ xx.

Ms. Van Meter resigned from her employment at UNM months before these decisions, on September 15, 2017.  Doc. 148 at 22, ¶ fff.

**IV.**    **President Stokes issues decision reversing OEO and finding a policy violation.**

Ms. Van Meter appealed OEO's determination that there was no policy violation to UNM's President, Dr. Garnett Stokes. Doc. 129 at 7, ¶ 18. On March 29, 2018, President Stokes reversed OEO's finding, reasoning in part that the evidence showed the parties "worked in close proximity with one another," which "created an objectively hostile work environment for [Ms. Van Meter] based on the sexual misconduct at issue," and such misconduct was "in violation of UNM policy." *Id.* at 7, ¶ 19.[6]

In reaching the conclusion that there was an objectively hostile work environment, President Stokes relied in part on the following evidence:

a. Although Plaintiff had no direct supervisory authority over Ms. Van Meter, his position at UNM gave him influence at her department level; therefore, an objective or reasonable person in Ms. Van Meter's position would fear retaliation or Plaintiff's negative influence on her work environment, Stokes Letter at 1 (Exh. A-7); and

b. The parties worked in close proximity to each other following the alleged sexual assault; therefore, an objective or reasonable person could find Ms. Van Meter was subjected to a hostile work environment based on the presence in her work environment of a person who sexually assaulted her. *Id.*

President Stokes noted as follows:

Further, other findings made by OEO in the PLOD/FLOD, including that Respondent's position afforded him opportunity to be influential at the department level if he so chose and that a reasonable person in Complainant's position would have feared retaliation and his potential negative influence in her work environment, demonstrate Complainant and Respondent worked in close proximity with one another. I, therefore, believe a reasonable person also could

---

[6] At certain times Plaintiff objects to consideration of statements in President Stokes's letter, while at others he asks the Court to consider the document. As explained above, the statements in the letter are not hearsay as they are not offered for the truth of the matter asserted. *Supra,* n.5.

find working in close proximity to Respondent post-October 14, 2016, created an objectively hostile work environment for Complainant based on the sexual misconduct at issue and in violation of UNM policy. Therefore, I also remand this discrete issue [to] OEO with the following instructions:

Reverse its conclusion that the incident did not create a hostile work environment on the grounds a reasonable person could not find Respondent interfered with Complainant's work environment post-October 14, 2016; and determine the Respondent's actions resulted in a hostile work environment for Complainant in violation of University Administrative Policies 2720, 2730 and 2740.

Doc. 129-8 at 1-2.

Plaintiff points out that "[t]he Department of Orthopedics [where Ms. Van Meter worked] is organizationally and physically separate from the Office of Research, where Mr. Briggs work[ed]." Doc. 148 at 22, ¶ eee, *citing* Pennick Aff., Doc, 148, Ex. 4 at 15-19, 22, 24, 25. "Ms. Van Meter [did] not work in the same building as Mr. Briggs." *Id.* Plaintiff further argues that *"*Mr. Briggs has no supervisory authority over Ms. Van Meter; she [was] completely outside of Mr. Briggs's chain of command at UNM." *Id.*

Dr. Stokes nevertheless found his presence created a hostile work environment. Defendants found that Plaintiff had influence in Van Meter's department; they were copied on the same emails, letters, and memos, which made it more difficult for her to perform her job; and it was determined there was a chance of the two running into each other. Doc. 129-2 at 26; Doc. 129-6 at 1, 2. Dr. Stokes instructed the OEO to reverse its determination and find that Plaintiff's actions "resulted in a hostile work environment for [Ms. Van Meter] in violation of University Administrative Policies 2720, 2730 and 2740." Doc. 129 at 8, ¶ 21

Plaintiff did not appeal the PLOD to President Stokes. Plaintiff submitted a letter disputing and challenging the fact findings against him in the PLOD, but acknowledged that there was no need for him to appeal the decision because UNM's investigator had ultimately found "No Policy Violation" and recommended closure of the file without further action. Doc.

148 at 21, ¶ aaa. Plaintiff was not provided with a copy of Ms. Van Meter's appeal, nor given any opportunity to respond to it before President Stokes issued a letter decision reversing the finding of "No Policy Violation" on March 29, 2018. Doc. 148 at 21, ¶ ccc.

Policy 2740 provides that both the complainant and respondent "have equal rights to seek a discretionary review of OEO's determination through the Office of the President" but does not expressly provide for a right to *respond* to an appeal to the President. Doc. 129-4 at 8, § 8. After receiving the President's reversal, Plaintiff had the opportunity to appeal the decision to the Board of Regents but apparently did not do so. *Id.* (Policy 2740 sets forth right to appeal President's decision to Board of Regents); *see also* Doc. 157 at 11, 24 (noting that Plaintiff did not appeal to Board of Regents). Moreover, President Stokes's Letter, which was sent to Plaintiff's counsel, informed him of his right to appeal to the Board of Regents within 30 days of the decision. Doc. 129-8 at 2. Although Plaintiff asserts he intended to appeal that decision, Plaintiff has not cited to evidence in the record to suggest he in fact appealed and Defendants ignored his appeal. *See, e.g.,* Doc. 148 at 42-43 (suggesting that Defendants ignored his request to appeal, but not citing to record in support of that assertion); Fed. R. Civ. P. 56(c)(1) (a party asserting a fact must support that assertion by citation to record); *Id.* (e)(1)-(4) (if a party fails to properly support a fact, the court may enter summary judgment or issue other appropriate order).

## V.    **Dr. Roth terminates Plaintiff's employment.**

After President Stokes made her decision, UNM then designated Mr. Briggs' immediate supervisor Dr. Richard Larson to impose discipline pursuant to its policies and practices. *See* Doc. 149 at 243, Ex. 30. Dr. Larson served as the Executive Vice Chancellor for UNM Health Sciences Center ("HSC") (the second highest position at UNM HSC) and Vice Chancellor for Research. Doc. 148 at 22-23, ¶ hhh. Dr. Larson recused from the disciplinary process. Dr. Larson

testified at a deposition and at the peer review hearing. He stated that he recused because (1) he did not receive the evidence or attachments supporting the findings in the PLOD; and (2) he believed he did not receive clear documentation setting forth the finding of policy violation, *i.e.*, whether Plaintiff was being disciplined for creating a hostile work environment or for sexual misconduct of a severe type. Dr. Larson Dep., Doc. 156-1 at 22:16- 23:5; 27:14-16; 28:18-25. He stated that he was concerned that "if I sanctioned him without clear documentation of what the finding was and what the violation was, that I would personally be liable to a suit from Mr. Briggs." Doc. 156-1 at 30:18-21. But the finding of the policy violation was in the PLOD, the FLOD, and Dr. Stokes's letter. The PLOD set forth in extensive detail the relevant factual findings, and Dr. Stokes's letter stated that Plaintiff's actions resulted "in a hostile work environment for Complainant in violation of University Administrative Policies 2720, 2730, and 2740." Doc. 149 at 260, Ex. 36.

UNM's normal practice and policy is to provide the evidence or exhibits relied upon in the PLOD. Doc. 148 at 23, ¶ kkk. While Dr. Larson was concerned that he did not receive the evidence or exhibits supporting the 28-page PLOD, he admitted that his role was not to reanalyze or reweigh the evidence that the OEO considered. Larson Dep, Doc. 151-2 at 22:9-23:5; 73:20-21; 81:18-24.

After Dr. Larson's recusal, Dr. Paul Roth was appointed to discipline Mr. Briggs. *See* Doc. 129 at 8, ¶ 22, *citing* Disciplinary Action Form (Exh. A-8). Dr. Larson asserted that Chamiza Pacheco de Alas[7], the Chief of Staff to the Executive Vice President at UNM's Health Sciences Center, allegedly told Dr. Roth that she wanted to "cut [Plaintiff's] dick off." Doc. 149, Ex 2, Larson Dep. at ¶ 15.  However, Ms. Pacheco de Alas was not a decisionmaker, and

---

[7] She is also at various times referred to by the parties and in the record, including transcripts, as "Chamisa Pacheco" or "Chamisa Pacheco de Alas."

Plaintiff has not established her role in the decision-making process by citation to the record. Therefore, her statements are inadmissible hearsay and alternatively, irrelevant. Doc. 157 at 27; Doc. 171-1 *citing* Sept. 18, 2019 (Vol. II) Tr. at 203:13-15.[8]

Dr. Roth testified that although he was considering discipline short of termination, he ultimately concluded "that termination was the only viable option." Doc. 157, Ex C., Roth Dep. at 98:8-14. Dr. Roth concluded that Ms. Van Meter did not have the capacity to consent. Doc. 157 at 28. He concluded that "[i]t is my belief that the violations described herein and the impact on the Complainant are of such serious and egregious nature that an accelerated disciplinary process is warranted." Doc. 157 at 28.

Plaintiff asserts that the involvement of UNM's VP of Human Resources, Dorothy Anderson, in the disciplinary process was unusual, but does not cite to evidence which supports that assertion. Plaintiff asserts that the usual practice is to assign a human resources staff member from the Client Services Unit. Anderson Dep., Doc. 149, Ex. 45 at 285-287. However, instead of assigning one of her subordinates to advise on the case, Dorothy Anderson herself advised on the case. OEO brought the complaint directly to her due to the nature of the complaint and the fact that Mr. Briggs was a high-level employee. Doc. 157 at 28, *citing* Anderson Dep., Doc. 149, Exhibit 45, at 285-287. Anderson stated she had discretion to deal with the termination herself if

---

[8] Ms. Pacheco de Alas was not a decisionmaker in the any of the decisions, including (1) the OEO's PLOD; (2) Dr. Stokes's letter finding a hostile work environment; (3) Dr. Roth's disciplinary action, or (4) the Peer Review Panel. "An employee's statements are not attributable to his employer as a party-opponent admission in an employment dispute unless the employee was 'involved in the decision-making process affecting the employment action' at issue." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1208–09 (10th Cir. 2010), *Jaramillo v. Colo. Judicial Dep't,* 427 F.3d 1303, 1314 (10th Cir.2005) (per curiam). Here, Plaintiff has not established or explained how Ms. Pacheco de Alas was involved in the decision-making process. He does not assert that she was involved in the drafting of the PLOD or FLOD, the issuance of discipline by Dr. Roth, or in the Peer Review Committee's three-day evidentiary hearing and decision.

an employee held a high-level position and it involved sensitive matters. Ms. Anderson identified three high profile investigations where she was similarly involved.  Doc. 148 at 25, ¶ rrr.

Ms. Anderson admitted that she wanted to fire Plaintiff in part because she was concerned that Ms. Van Meter would sue UNM. Doc. 148 at 26, ¶ sss. Plaintiff asserts that Dr. Roth terminated Plaintiff at Ms. Anderson's urging. *See* Doc. 148 at 26, ¶ ttt. However, as explained above, Dr. Roth believed termination was appropriate and the only viable option.

Plaintiff asserts he was a longstanding exemplary employee, who from 2006 until 2019 received multiple pay raises, promotions, and positive performance reviews.  Doc. 148 at 8, ¶ a-b.  He asserts he never received any other complaint for any reason.  Doc. 148 at 8, ¶ c.  He has never been arrested, charged, or convicted of any crime, and was not arrested or charged in connection with the alleged sexual assault. Doc. 148 at 9, ¶ d.

UNM issued Plaintiff a Notice of Contemplated Action (NCA) for discharge. Doc. 129 at 8, ¶ 23 *citing* Disciplinary Action Form at 1 (Exh. A-8 to Cordova Decl.) (confirming that Plaintiff was "given a Notice of Contemplated Action (NCA) for Discharge for unprofessional and unacceptable behavior; specifically, creation of a hostile work environment in violation of UNM Policy"). Plaintiff submitted a written response to the NCA. Doc. 129 at 8, ¶ 24, *citing* Disciplinary Action Form at 1 (Exh. A-8 to Cordova Decl.) (confirming Plaintiff's submission of a response to the NCA). Dr. Roth ultimately terminated Plaintiff's employment. Doc. 129 at 8 ¶ 25.

**VI.**    **Peer Review Panel evidentiary hearing and decision.**

Plaintiff requested a peer review hearing to challenge his termination. Doc. 129 at 8, ¶ 26 *citing* Doc. 129-10, Nov. 13, 2019 Letter from Emmons, Jaramillo, and Kasparian to Plaintiff at 1 (Exh. A-9 to Cordova Decl.).

Defendants held a three-day hearing before a three-person panel (the "Peer Review Panel") during which Plaintiff had the assistance of counsel, called and cross-examined witnesses, offered documentary evidence, and submitted written, post-hearing briefs for the panel's consideration. Doc. 129 at 8, ¶ 27, citing Nov. 13, 2019 letter at 1 (Exh. A-9). However, counsel was not authorized to speak on Plaintiff's or Ms. Van Meter's behalf, and Plaintiff had to submit written cross-examination questions of Ms. Van Meter, to be asked by the panel. The panel issued its eight-page decision upholding the termination. Doc. 129 at 8, ¶ 28.

Plaintiff did not appeal any decision to the Board of Regents.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996). To avoid summary judgment, a party "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988) (quotation marks and citations omitted).

"A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the

nonmoving party on the evidence presented." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (quotation marks and citation omitted).

When making this determination, the Court keeps two principles in mind. First, while the Court must draw all "reasonable inferences … in the light most favorable to the non-moving party*," id*. at 1261, that party's "version of the facts must find support in the record," *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). Second, the Court's role is not to weigh the evidence or decide any issues of credibility, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249, 255.

## DISCUSSION

## I.   <u>Motion to Strike Evidence.</u>

Defendants seek to strike evidence Plaintiff submitted to oppose summary judgment.  As explained below, the Court grants in part and denies in part Defendants' request.

Defendants generally assert that certain evidence presented by Plaintiff in his appendix (Doc. 149) should be stricken for the following reasons:

- Certain evidence was not disclosed by Plaintiff during discovery;

- The evidence is inadmissible, *see* Fed. R. Civ. P. 56(b)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); and

- Plaintiff presented a sham affidavit.

### A.   **The Court declines to strike Mr. Allen's declaration.**

Defendants move to strike the Declaration of Hubert Allen (Doc. 149, Ex. 1) and the First Declaration of Mr. Briggs (Doc. 149, Ex. 3).  In those declarations, they reviewed and

summarized the 371 disciplinary records produced by UNM regarding complaints of sexual misconduct or sexual harassment.

After various discovery disputes, in September and October 2024 UNM produced 371 files regarding its handling of complaints that UNM categorized as sexual misconduct or sexual harassment. Mr. Allen reviewed those files, and determined how many of those files (1) were investigated, (2) resulted in a finding of a violation of UNM policy, and (3) resulted in the imposition of discipline. He also counted how many respondents in each category were male or female. *See* Doc. 156 at 4; Allen Decl., Doc. 149 at 5. Plaintiff did the same.

Mr. Allen's declaration summarizes his review of the disciplinary records and performs basic arithmetic. He noted as follows. Of the 269 complaints made against male respondents, 126 (or 46.8%) were investigated by the OEO. Of the 102 complaints made against female respondents, 7 (or 6.9%) were investigated by the OEO. Based on these numbers, Mr. Allen calculated that male respondents were investigated by the OEO at a rate of 6.8 times greater than female respondents. Doc. 14, Exhibit 1, at 4.

Moreover, after viewing each file, he noted that of the 269 complaints against male respondents, 78 (or 29%) resulted in a finding of a policy violation against the male respondent. Of the 102 complaints made against female respondents, only 1 (or less than 1%) resulted in a policy violation against the female respondents. Two female respondents were referred for a hearing and the outcome was not clear from the records. Doc. 149 at 6. Plaintiff's declaration gave similar opinions.

Defendants assert that Mr. Allen's and Plaintiff's declarations should be excluded because they include expert testimony which was not disclosed as required under Rule 26(a). Plaintiff asserts that Mr. Allen is not testifying as an expert in his declaration, but instead merely

provides a Fed. R. Evid. 1006 summary or calculation. The Court agrees with Plaintiff and concludes that Mr. Allen does not present expert testimony in his declaration. The declaration expresses no expert opinions, but merely summarizes discovery produced by Defendants and applies grade-school mathematics.  Defendants admitted that Mr. Allen simply engaged in basic arithmetic. This is lay testimony because the witness merely added or subtracted numbers and took an average. *See United States v. Hamaker*, 455 F.3d 1316, 1331 (11th Cir. 2006); *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005). "The Federal Rules of Evidence clearly permit the contents of voluminous writings to be presented in the form of a 'chart, summary, or *calculation.*'" *Bryant,* 432 F.3d at 1124, *quoting in part* Fed. R. Evid. 1006 (emphasis added). "Taking a simple average of … numbers, though technically a statistical determination, is not so complex a task that litigants need to hire experts in order to deem the evidence trustworthy." *Id.* "A mathematical calculation well within the ability of anyone with a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed. R. Evid. 701." *Id.*

Defendants assert that the statistical analysis in the declaration is too basic to constitute adequate statistical analysis or to prove a gender bias. To the extent Defendants fault the affidavit for not going farther into more complex statistical analysis, that is not a basis to exclude the Rule 1006 summary. Rather, Defendants' argument is more appropriately considered as to whether Plaintiff presented sufficient evidence to create a genuine dispute of material fact. The Court will address that argument below.

Defendants alternatively assert that Mr. Allen's declaration should be excluded even if it is mere lay opinion testimony, as he was not disclosed as a witness in evidence as required under Rule 26(a) and (e), and his declaration was not disclosed.  The Court concludes that any failure

to identify Mr. Allen in discovery as a witness who would provide a Rule 1006 summary was substantially justified or harmless and declines to exclude the evidence.

Federal Rule of Civil Procedure 37(c)(1) addresses a party's failure to disclose or supplement initial disclosures, providing that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." "[T]he determination of whether a Rule 26(a) [or (e)] violation is justified or harmless is entrusted to the broad discretion of the district court." *Neiberger v. Fed Ex Ground Package Sys., Inc.*, 566 F.3d 1184, 1191–92 (10th Cir. 2009) (quoting *Woodworker's Supply, Inc.*, 170 F.3d at 993); *accord Jacobsen v. Deseret Book Co*., 287 F.3d 936, 953 (10th Cir. 2002). However, the Rule 37(c)(1) inquiry "depends upon several factors that a district court *should* consider in exercising its discretion." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1129 (10th Cir. 2011) (emphasis added). These factors include: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply, Inc.*, 170 F.3d at 993; *quoted in HCG Platinum, LLC v. Preferred Prod. Placement Corp.*, 873 F.3d 1191, 1200 (10th Cir. 2017).

Moreover, where the exclusion of evidence "has the necessary effect of a dismissal" the court must "carefully explore and consider the efficacy of less drastic alternatives, ordinarily reserving the extreme sanction of dismissal for cases involving bad faith or willfulness or instances where less severe sanctions would obviously prove futile." *HCG Platinum, LLC*, 873 F.3d at 1206.

As to the first *Woodworker* factor, Defendants are not prejudiced or surprised by the lay testimony offered. Although Mr. Allen was not disclosed as a witness in discovery, he merely summarizes voluminous evidence produced by Defendants and provides a calculation using basic arithmetic. Mr. Allen's declaration summarizes and provides a calculation of 371 files produced by Defendants. This discovery was produced following extensive discovery disputes. Finally, the parties discussed the need for the discovery in light of Tenth Circuit published case law. Thus, Defendants were or should have been aware that the discovery they produced would be presented in this case as statistical evidence in a Rule 1006 summary. Moreover, Defendants do not assert in the motion to strike that they desire to present their own summary to correct an error in Plaintiff's summaries.

As to the second factor, Defendants do not argue that they need to take any action, or need additional time, to cure any prejudice. Mr. Allen's declaration is a summary of Defendants' discovery produced in September and October 2024. Defendants assert they would need to obtain their own expert rebuttal witness to any expert testimony by Plaintiff. But Mr. Allen and Plaintiff's declarations do not include any expert testimony. Moreover, given the extensive discovery proceedings regarding these disciplinary files, and the prior discussion of the relevancy of statistical evidence at discovery conferences, Defendants were aware that the disciplinary files would be presented in some statistical form or Rule 1006 summary. *See, e.g.,* Plaintiff's Response to Motion to Quash Subpoena, Doc. 101 (arguing that the disciplinary files were relevant).

As to the third factor, allowing the summaries would not further disrupt summary judgment. Defendants only seek exclusion, and do not assert that they need additional time to present their own summary.

Finally, Plaintiff did not act in bad faith or willfully. The evidence has been the subject of discovery proceedings since October 4, 2023. The discovery was partially produced by Defendants in September 2024, and fully produced by October 2024. Defendants filed their summary judgment motion on December 20, 2024. The declarations were signed on February 4, 2025 and February 5, 2025, and produced on February 6, 2025. Doc. 141. The Court believes this was a reasonable amount of time to review the 371 files and produce a summary or calculation.

Thus, after considering the *Woodworker* factors, the Court concludes that any failure to produce the Rule 1006 summary or Mr. Allen's lay opinion testimony summarizing Defendants' discovery was substantially justified or harmless. Therefore, the Court declines to exclude Mr. Allen's or Plaintiff's declaration.

### B.    Dr. Larson's Declaration.

Defendants move to strike Dr. Larson's affidavit as (1) it was never produced in discovery; (2) it is a sham affidavit; and (3) it contains inadmissible testimony. Dr. Larson was Plaintiff's direct supervisor at UNM, who praised Plaintiff in reviews and recused from the disciplinary process.

Defendants assert that Dr. Larsons' declaration is inconsistent with his prior deposition testimony and therefore should be stricken as a sham affidavit. Courts may disregard an otherwise proper affidavit if the court first determines that the affidavit's purpose is to create a sham issue of material fact. *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014). "Sham affidavits, though 'unusual,' arise when a witness submits an affidavit that contradicts the witness's prior testimony." *Id.,* citing *Law Co. v. Mohawk Const. & Supply Co.,* 577 F.3d 1164, 1169 (10th Cir. 2009).

"In determining whether an affidavit creates a sham fact issue, [the Court] consider[s] whether: '(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.' " *Knitter*, 758 F.3d at 1218 n.3.

At the deposition, Dr. Larson was directly asked about three alleged concerns, that (1) the investigation was flawed (2) the investigation had been biased, and (3) there is evidence that had not been considered.  Larson Dep., Doc. 156-1 at 28:7-12.  Dr. Larson responded "**I think that's a misinterpretation of my concerns**."  *Id.* at 28:15-16 (emphasis added). He went on to explain that he wanted a single document which sets out the findings and the policy violations. The Court finds that Dr. Larson's deposition directly contradicts his declaration because he expressly denied that he believed the investigation was flawed, biased, or there was evidence that was not considered. He was cross-examined during his earlier testimony, he had access to pertinent evidence at the time he was deposed, and his declaration does not correct any confusion. Therefore, to the extent the declaration contradicts his deposition testimony, the Court declines to consider it.

Plaintiff asserts that Dr. Larson's testimony did not contradict his declaration, but he is merely giving answers "more freely" now that he is no longer employed by UNM.  *See* Doc. 156 at 16. A suggestion that Dr. Larson may not have given truthful answers because he was employed by UNM at the time is troubling and does not ease the Court's concern that he has presented a sham affidavit directly contrary to deposition testimony. *See Id.* ("Now that he is no longer employed by UNM, Dr. Larson's declaration more freely goes into detail about UNM's irregular process and Dr. Larson's concerns about bias….").

Therefore, the Court will not consider the portions of Dr. Larson's declaration which contradict his deposition testimony, such as statements that he believes the investigation was biased or flawed, or that all evidence was not considered. Alternatively, even assuming the Court considers Dr. Larson's declaration, the Court finds that it does not create a genuine dispute of material fact precluding summary judgment, as explained below.

### C.    Newspaper articles.

Defendants move to exclude various newspaper articles included in Plaintiff's appendix. Defendants assert they are inadmissible hearsay. However, Plaintiff does not appear to offer the newspaper articles for the truth of the matter asserted. Rather, he offers them to show the effect on UNM, i.e., that the newspaper articles pressured UNM to investigate and prosecute men. Therefore, the Court declines to strike the newspaper articles.

### D.    Relevancy.

Defendants seek to strike certain documents, arguing they are irrelevant. The Court declines to strike any specific evidence on the grounds of relevancy alone. Rather, whether Plaintiff's asserted facts and supporting evidence create a genuine dispute of material fact precluding summary judgment will be addressed below. *See Jones v. Barnhart*, 349 F.3d 1260, 1270 (10th Cir. 2003) (affirming district court's evidentiary ruling that denied a motion to strike an affidavit on summary judgment and instead "relied on the declarations to the extent that they contained relevant and admissible material, ignoring inadmissible and irrelevant statements").

## II.    <u>The Court enters summary judgment in favor of Defendants on Plaintiff's Title IX claim.</u>

Defendants UNM and UNM Board of Regents move for summary judgment on Plaintiff's Title IX claim (Count II). At issue is whether Plaintiff's sex was a motivating factor in

his employment termination. As explained below, the Court concludes that Plaintiff has not created a genuine dispute of material fact that his sex was a motivating factor in his termination. The Court therefore enters summary judgment in Defendants' favor.

Title IX of the Education Amendments Act of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To succeed on a Title IX claim, "a plaintiff must show: (1) that he or she was excluded from participation in, denied the benefits of, or subjected to discrimination in an educational program; (2) that the program receives federal assistance; and (3) that the exclusion from the program was on the basis of sex." *Seamons v. Snow*, 84 F.3d 1226, 1232 (10th Cir. 1996). "Where a Title IX plaintiff relies on indirect proof of discrimination, we apply the three-part burden-shifting framework announced in *McDonnell Douglas*." *Doe v. Univ. of Denver,* 1 F.4th 822, 829 (10th Cir. 2021); *see also Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017) ("The *McDonnell Douglas* framework applies" to "Title IX sex discrimination claims.").

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case for discrimination or retaliation by showing the university took adverse action against the plaintiff based on the plaintiff's sex. *Bird v. W. Valley City*, 832 F.3d 1188, 1200 (10th Cir. 2016) (sex discrimination claim); *Fye v. Oklahoma Corp. Commission*, 516 F.3d 1217, 1225 (10th Cir. 2008) (retaliation claim). The burden then shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for the adverse action." *Bird*, 832 F.3d at 1200. If the defendant satisfies this burden, "then summary judgment is warranted unless [the plaintiff] can show there is a genuine issue of material fact as to whether the proffered reason[ ] [is]

27

pretextual." *Id.* (quotations omitted). To prove pretext, the plaintiff "must produce evidence of weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [university's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the [university] did not act for the asserted nondiscriminatory reasons." *Doe v. Univ. of Denver*, 1 F.4th 822, 829 (10th Cir. 2021) ("*Doe II*") (internal quotation marks omitted).

To determine if the plaintiff has established a prima facie case for discrimination, the Court must ask, "[c]ould a reasonable jury – presented with the facts alleged – find that sex was a motivating factor in the school's disciplinary decision?" *Id.* A plaintiff may use, but is not limited to, the "erroneous outcome" and "selective enforcement" frameworks to establish that sex was a motivating factor in the school's decision. *Id.*

Plaintiff's briefing focuses on the erroneous outcome test. "Under the "erroneous outcome" test, a plaintiff must set forth (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a particularized causal connection between the flawed outcome and sex bias." *Id.* at 830. "To satisfy the 'selective enforcement' test, a plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her sex." *Id.* However, under either test, the fundamental question is whether Plaintiff's sex was a motivating factor in his employment termination.

Plaintiff argues that the Court should deny summary judgment on the same grounds identified in *Doe II*. In *Doe II*, the Tenth Circuit found that a male plaintiff had demonstrated that his sex was a motivating factor in his expulsion for allegedly committing sexual assault because he (1) showed that the investigation was "replete" with "egregious" procedural irregularities or deficiencies *along with substantial reasons to discount the alleged victim's allegations*, (2) plus

statistical evidence which demonstrated that the university treated men differently than women. *Doe v. Univ. of Denver*, 1 F.4th 822, 831–32 (10th Cir. 2021). Here, the Court concludes that Plaintiff has not demonstrated egregious procedural irregularities or deficiencies along with substantial reasons to discount Ms. Van Meter's allegations. Moreover, the statistical evidence is too generalized and simplistic to eliminate non-gender-based reasons for the discrepancies, or to show that UNM was biased against men.

### A.    Prima Facie Case

Plaintiff asserts that he has established a prima facie case – *i.e.*, that his sex was a motivating factor in his termination – for the following reasons:

- UNM was pressured by the DOJ to investigate and discipline sexual assault cases;
- There were procedural irregularities or deficiencies in the investigation and disciplinary proceeding;
- The outcome was erroneous (*i.e.,* Ms. Van Meter should not have been believed); and
- Statistical evidence demonstrates bias against male respondents.

As explained below, the Court rejects each of these arguments.

First, the DOJ letter and investigation did not expressly seek to protect women at the expense of men. Rather, it was facially neutral and focused on creating adequate procedures to protect sexual assault victims and investigate sexual assault respondents.

Second, Plaintiff has not demonstrated that there were substantial procedural irregularities or deficiencies in the investigation and disciplinary process. To the extent there were irregularities, they were not so substantial as to suggest bias, and do not shed doubt on the ultimate outcome.

Third, there are not substantial reasons to doubt Ms. Van Meter's story or the outcome of the disciplinary proceeding. Her story was consistent and supported by other evidence, and Defendants' conclusion that Plaintiff committed penetrative sexual assault because she was incapable of consenting was reasonable. It is not the Court's role to reweigh the evidence and come to a different conclusion.

Finally, Plaintiff's Rule 1006 summary or calculation of UNM disciplinary records is insufficient to demonstrate that UNM's disciplinary process as to Plaintiff was motivated by anti-male bias.

1.   <u>External pressure, such as the DOJ investigation and news articles, does not demonstrate gender bias</u>.

Plaintiff cites to certain evidence of external pressure, including (1) a DOJ Letter regarding its investigation of UNM's handling of sexual assaults, (2) news articles regarding sexual assaults at UNM, and (3) an agreement between the DOJ and UNM.

Evidence that a school felt pressure to conform with DOJ guidance does not provide evidence of gender discrimination, especially here where the pressure was facially gender-neutral. *Doe v. Univ. of Denver*, 952 F.3d 1182, 1192–93 (10th Cir. 2020) ("*Doe I*"). "[S]uch evidence is insufficient in itself to support any inference that the school's actions in a particular case were motivated at least in part by gender bias." *Id.* Thus, *Doe I* concluded that outside "pressure [the university] felt to comply with its guidance cannot support his summary judgment burden unless combined with a particularized 'something more,' that would indicate that [the university's] decision in his particular case was based on his gender." *Id.* at 1193, *quoting in part Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 856 (7th Cir. 2019).

Here, there is nothing in the DOJ letter that suggests that UNM was pressured to specifically disfavor male respondents. The DOJ Letter and UNM's agreement with the DOJ are facially neutral. For example, they did not pressure UNM to do more to protect *women* or punish *men*, but rather asserted that UNM was not adequately investigating or addressing sexual assault generally. Even assuming the DOJ letter and agreement pressured UNM to act differently, pressure to investigate sexual assaults does not demonstrate that UNM acted with an anti-male bias rather than merely a pro-victim bias.

Plaintiff also cites to news articles regarding sexual assaults on the UNM campus. The exhibits provided by Plaintiff do not establish a gender-based motive in responding to allegations of sexual assaults. *See, e.g.,* Doc. 149, Ex. 7-14. The articles generally discuss sexual assaults, the DOJ's investigation, or specific cases and settlements brought by alleged sexual assault victims. But none of them suggest action be taken against men. There is nothing to suggest that news articles motivated anti-male action by Defendants. To the extent it did motivate action by Defendants, taking action to discipline sexual assaults or avoid lawsuits by alleged victims of sexual assault is not gender-based discrimination.

2.   Plaintiff has not demonstrated a likelihood that the outcome was erroneous.

Plaintiff asserts that the outcome was erroneous. In determining whether sex was a motivating factor in Plaintiff's termination, the Court may consider whether the outcome was erroneous and whether the evidence substantially favored Plaintiff. In *Doe I,* the Tenth Circuit assumed without deciding "that an inference of bias arises when an evaluator's decision in favor of one side lacks an apparent, evidence-based reason, and the evidence substantially favors the other side." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1197–98 (10th Cir. 2020). The *Doe I* court concluded that "investigators were not faced with a situation in which the evidence substantially

favored Plaintiff." *Id.* Evidence showing an erroneous outcome may include, but is not limited to, evidentiary weaknesses such as a motive to lie, strengths of the defense, procedural flaws affecting proof, or a reason to doubt the veracity of the charge. *Ruff v. Bd. of Regents of Univ. of New Mexico*, 272 F. Supp. 3d 1289, 1298 (D.N.M. 2017).

Here, the evidence before UNM did not substantially favor Plaintiff. Rather, Defendants reasonably concluded that Plaintiff sexually assaulted Ms. Van Meter because she lacked the capacity to consent. Defendants' conclusion was clearly evidence based and was reasonable under the circumstances. It is not the Court's role to reweigh the evidence, or to decide whether Plaintiff sexually assaulted Ms. Van Meter. Rather, the Court simply concludes that Defendants' decision was well-supported in the record, and the evidence does not substantially favor Plaintiff.

In a 28-page decision, the PLOD, the OEO cited to the relevant evidence, made extensive findings of fact, and concluded that Ms. Van Meter lacked the capacity to consent and Plaintiff sexually assaulted her. In a subsequent letter, Dr. Stokes concluded that Plaintiff's actions violated UNM policy by creating a hostile work environment. Dr. Roth, in imposing discipline, also concluded that Ms. Van Meter lacked the capacity to consent to sexual activity. Finally, Plaintiff challenged his termination to the Peer Review Panel. The Peer Review Panel held a three day evidentiary hearing and issued an eight page decision. It similarly concluded that Ms. Van Meter lacked the capacity to consent to sexual activity and affirmed the Plaintiff's termination.

In reaching this conclusion, Defendants reasonably considered Ms. Van Meter's story, the police report, the SANE examination report and physical injuries, Plaintiff's factual admissions, text messages, and various other statements in deciding that she was not capable of consenting to sexual activity, as defined by UNM policy. Unlike in *Doe II*, Ms. Van Meter's

story was not inconsistent or incoherent. In *Doe II*, the Tenth Circuit noted that the alleged victim "told an array of inconsistent stories about the alleged incident." *Doe v. Univ. of Denver*, 1 F.4th 822, 833 (10th Cir. 2021) ("*Doe II*"). It also noted that "none of the witness accounts completely align with the story she told investigators." *Id.* That is not the case here. Ms. Van Meter's story was consistent and supported by corroborating evidence. Plaintiff presents his own story, but his story does not establish incoherencies or inconsistencies in Ms. Van Meter's story to the extent she should or must be disbelieved.

Plaintiff asserts that Ms. Van Meter was not credible or had motives to lie. Even assuming that were true, her story was supported by other evidence, including certain factual admissions by Plaintiff. Plaintiff admitted that she told him she had vomited, and that he drove her home because she was unwell. Doc. 149 at 145-46. Text messages demonstrated that Ms. Van Meter accidentally texted her friend in Maine to pick her up instead of her husband. Moreover, Plaintiff admitted to police that she did not react at all to oral sex. Doc. 149 at 144. A SANE report documented her physical injuries, including bruises to both of her legs as well as genital tears and abrasions. Doc. 149 at 140. When Ms. Van Meter arrived home, her husband observed that she was so intoxicated that he refused to leave their child with her, and instead took their child to work. This was sufficient under UNM policy to establish that Ms. Van Meter lacked the capacity to consent. The Peer Review Decision explained UNM's policy on consent as follows:

> OEO [the Office of Equal Opportunity] examines the record for other behavior like stumbling or otherwise exhibiting loss of equilibrium; slurred speech or word confusion; bloodshot, glassy or unfocused eyes; vomiting, especially repeatedly; being disoriented, or confused as to time or place; or loss of consciousness.
>
> Should the preponderance of the evidence in the record demonstrate that one or more such behaviors were objectively apparent at the time the alleged unconsented-to or unwelcomed sexual activity occurred, then the evidence may

> demonstrate that the respondent knew or should have known that the complainant
> was incapable of giving meaningful consent to sexual activity due to intoxication.

Peer Review Decision, Cordova Dec. Ex A-9, Doc. 129-10 at 3.  In her own version of events, many if not most of these indicia were present. But Plaintiff also admitted that she vomited and did not feel well enough to drive, which are reasonable indicia that she was not capable of consenting under UNM's written policy.

Plaintiff asserts that UNM's President, Dr. Stokes, unreasonably concluded that penetrative sexual assault may create a hostile work environment. As set forth in the Peer Review Panel's decision, UNM's policy expressly provides that "a single incident (such as sexual assault) may be so severe as to create a hostile environment."  Peer Review Decision, Doc. 129-10 at 2. President Stokes concluded that Plaintiff had an influential position, a reasonable person would have feared retaliation and potential negative influence in her work environment, Plaintiff was included on Ms. Van Meter's work emails and memoranda, and the parties worked in close proximity with one another. Dr. Stokes therefore found that an objectively hostile work environment was created based on the sexual misconduct at issue, in violation of policies 2720, 2730, and 2740. Doc. 129-8 at 1-2. To the extent Plaintiff asserts that the hostile work environment policy was not in effect at the time of the incident, the Court disagrees. The uncontroverted evidence demonstrates that this policy was in effect at the time of the incident. Cordova Dec., Doc. 129-1 at 1-2; *Id.,* Exhibit A-4, Doc. 129-5.

Plaintiff suggests that the Defendants relied upon policies which were updated after the alleged sexual assault. Plaintiff cites to the record suggesting that policies 2720 and 2740 were updated on February 26, 2018, but he does not cite to the record demonstrating any relevant differences between the two versions, nor has he presented any evidence that Defendants relied on updated portions of the policy to his detriment. Doc. 149 at 258. Rather, the OEO issued its

34

PLOD describing the policy violations on December 4, 2017, before the changes were made. Doc. 129-2 at 1.

In the disciplinary proceeding, Plaintiff asserted facts which he believes show that Ms. Van Meter was interested in sexual activity with him, such as meeting him at a restaurant, drinking with him, and going to his home to drink further. He asserts she positively responded when he kissed her. But UNM has a policy that "consent to one form of sexual activity does not imply consent to other forms of sexual activity." Doc. 129-4, § 3. Being friends with Plaintiff, drinking with him, and even kissing him (which is disputed) does not ultimately demonstrate that she had the capacity to consent to sexual activity with him.

Plaintiff points to Ms. Van Meter's alleged motivation to either engage in sexual activity with him or to cover up an alleged affair. He asserts that she argued with her husband before they met for drinks. Defendants considered these facts but concluded, based on the evidence, that Ms. Van Meter's fight with her husband and alleged motive to cover up an alleged affair did not establish that she had the capacity to consent to sexual activity. Under the circumstances, this determination is entirely reasonable.

Plaintiff also argues that the OEO ignored a drug test that disproved Ms. Van Meter's claims. The Court disagrees. The PLOD expressly addressed the drug test. It noted that she received medical attention 48 hours after the incident occurred, which means that the test could not conclusively determine whether she was drugged. PLOD, Doc. 129-2 at 8 n.9. The PLOD also considered the police report, which stated that "GHB was not tested for due to the time delay between the alleged assault and the collection of the urine sample." *Id.* To the extent Plaintiff asserts that the PLOD ignored negative DNA testing, Plaintiff eventually admitted to possibly penetrating the victim with his finger, and the SANE examination showed bruises to her

legs and injuries to her genitals. Doc. 149 at 140, 146. Thus, DNA testing was not essential to determining whether Ms. Van Meter was capable of consent.

Finally, Plaintiff's statements had some inconsistencies.  He at first denied penetrating Plaintiff. Doc. 149 at 145.  After being warned about DNA testing, he admitted he might have penetrated her.  Doc. 149 at 146.

Thus, Plaintiff has not established an erroneous outcome, that the outcome was not supported by evidence, or that evidence substantially favored him.

3.    Plaintiff has not demonstrated substantial procedural irregularities or deficiencies which suggest bias or discriminatory intent.

Plaintiff appears to argue that procedural irregularities or deficiencies in the investigation and disciplinary process create an inference of sex discrimination. He lists a variety of alleged procedural irregularities or deficiencies.  The Court disagrees and concludes that Plaintiff has not demonstrated sufficient procedural irregularities or a one-sided investigation to create an inference of sex discrimination.  *See, e.g., Doe v. Univ. of Denver*, 1 F.4th 822, 831 (10th Cir. 2021) (noting that evidence of a one-sided investigation, procedural irregularities, or bias, may establish sex discrimination). To the extent he has established irregularities or deficiencies, they generally do not cast doubt on the outcome.

Plaintiff asserts that he was not given the opportunity to respond to Ms. Van Meter's appeal of the Final Letter of Determination ("FLOD") to Dr. Stokes.  However, as explained below, Plaintiff did have the opportunity to participate and present evidence (1) prior to the imposition of discipline, and (2) in the peer review panel's evidentiary hearings and review. He also apparently did not perfect appeals twice to the Board of Regents. Plaintiff had the opportunity to appeal President Stokes's decision to the Board of Regents.  Doc. 129-4 at 8; Doc.

129-8 at 2 (notifying Plaintiff of the appeal policy to the Board of Regents). He was also informed of his ability to appeal the Peer Review Panel's to the Board of Regents.  Doc. 149, Ex. 42 at 274-276.

Plaintiff asserts that Defendants ignored that Ms. Van Meter deleted text messages that were allegedly exculpatory. Doc. 140 at 137. He asserts that Defendants did not consider or find that intentional destruction of exculpatory evidence should weigh against Ms. Van Meter.  Doc. 148 at 19, ¶ rr.  However, Plaintiff and Ms. Van Meter provided text messages to the OEO, and the OEO considered them. Ms. Van Meter gave permission to the Albuquerque Police Department ("APD") to attempt to retrieve them from her phone.  Doc. 141 at 108.

Notwithstanding the absence of certain messages, Defendants obtained various text messages as part of the investigation and concluded that the text messages were not exculpatory. The PLOD extensively considered text messages, including ones provided by Plaintiff. Doc. 129-2 at 2, 4, 5, 8, 10, 11, 13 14, 18, 19, 23, 25.  The PLOD concluded that the text messages were not exculpatory and did not demonstrate that she had any sexual interest in Plaintiff.  *Id.* at 19.  Moreover, Defendants found the text messages supported her story that she was sick and did not remember what transpired when she arrived home.  *Id.* at 25.

The APD Police Report described some of the text messages as follows.  *See* Doc. 149, Exhibit 16 at 143. Ms. Van Meter asked Plaintiff "So how bad was it when we got to my house?" *Id.* at 143.  Plaintiff responded "It wasn't great" and later added "I didn't say much other than you weren't feeling well and I needed to make sure you got home safely." *Id.* at 143.  Moreover, Plaintiff stated "What are you going to say? Besides drank too much." *Id.* Defendants considered the text messages and the police report. Thus, Defendants reasonably found that the text

messages supported the victim's allegation that she got sick at Plaintiff's home, and was in an impaired state both at Plaintiff's home and when she arrived at her home.

Moreover, to the extent Ms. Van Meter and her husband deleted text messages related to their argument which were not recovered and submitted to Defendants, the OEO interviewed her husband about the argument and text messages, and her husband discussed the text messages with police. The OEO considered these interviews and reasonably concluded that Ms. Van Meter's argument with her husband did not establish that she had the capacity to consent to sexual activity. *See* Doc. 129-9 at 1.

Plaintiff asserts that Defendants ignored Ms. Van Meter's argument with her husband, in which she asked him how he would feel if she kissed Plaintiff. The argument started after she saw advertisements of her husband, who was acting in a theatrical production, kissing an actress. The OEO considered the argument and questioned Ms. Van Meter's husband about it. See Doc. 129-2 at 13-14. It noted that the statement was made in the heat of an argument, and did not show that she intended to participate in sexual activity with Plaintiff. Doc. 129-2 at 19. Ultimately, this fight did not convince Defendants that her story was fabricated. This was a reasonable conclusion, as her fight with her husband does not provide evidence that she was able to consent to sexual contact with Plaintiff. Defendants therefore appropriately considered this evidence. Even assuming she intended to kiss Plaintiff, under UNM's policy this does not bear on whether she had the capacity to consent to *further* sexual activity.

Plaintiff also asserts that Defendants failed to give weight to his allegation that Ms. Van Meter initiated meeting Plaintiff for drinks, that she agreed to go to his house, and that she offered to pick up beer on the way. He asserts that all of these suggest that she wanted to participate in sexual activity with him. The Court disagrees. None of this bears on whether

Plaintiff consented to, or had the capacity to consent to, sexual activity later in the evening. Defendants appropriately discounted the weight of this evidence.  Doc. 129-9 at 1.

Plaintiff's remaining challenges do not change the analysis. He asserts that Ms. Van Meter's interview with Defendants should have been recorded. But Plaintiff has not cited to case law demonstrating that this is a procedural irregularity.

To the extent Plaintiff believes Defendants should have weighed in his favor a police officer's statement that it sounded like the victim was flirting with Plaintiff, such statement does not bear on whether Ms. Van Meter had the capacity to consent to sexual activity with Plaintiff. Doc. 148 at 38.

Plaintiff also asserts that the OEO failed to interview Mr. Dillenback, who had no information about the alleged sexual assault. The PLOD represents that Mr. Dillenback refused to interview with the OEO, but Mr. Dillenback alleges he was never contacted by the OEO. *See* Doc. 148 at 40, n.120, 121.  Mr. Dillenback had no knowledge of the alleged assault but testified in this case regarding Ms. Van Meter's prior sexual history. Plaintiff appears to assert that the OEO should have considered Ms. Van Meter's prior sexual history, or the Court should consider it. The Court fails to see how her sexual history bears on her capacity to consent with Plaintiff during the events in question in this case. Rather, there is generally a presumption that such evidence is not relevant. For example, under Federal Rule of Evidence 412(a), "evidence offered to prove that a victim engaged in other sexual behavior; or evidence offered to prove a victim's sexual predisposition" is not admissible.  Fed. R. Evid. 412(a).  Plaintiff does not explain how the evidence of her prior sexual history with others is admissible. Even assuming the victim's sexual history with others were admissible, it simply does not bear on her state of intoxication in this case. *See, e.g.*, *Chapman v. Carmike Cinemas*, 307 F. App'x 164, 172 n.2 (10th Cir. 2009)

(noting "we see no reason why Rule 412 should not be applied in summary judgment proceedings…."). In other words, whether Ms. Van Meter kissed Mr. Dillenback has no bearing on this case. Nor does Plaintiff present evidence that Ms. Van Meter submitted a prior false report to the OEO regarding any interaction with Mr. Dillenback which they should have considered.

Plaintiff asserts that Ms. Van Meter was dishonest in her deposition about whether she kissed Mr. Dillenback. In the deposition she said she did not kiss him, but the next day she submitted corrections. Doc. 149, Ex. 36 at 266. But that alleged dishonesty occurred in a deposition in a federal civil case *after* Plaintiff was terminated.[9] The Defendants did not err in not considering something which had not yet happened. Plaintiff does not assert that he brought this issue to the Peer Review Panel's attention. Doc. 148 at 39-40.

Plaintiff points to a statement by Dr. Larson, in which he asserts that Chamiza Pacheco de Alas, the Chief of Staff to the Executive Vice President at UNM's Health Sciences Center, allegedly told Dr. Roth that she wanted to "cut [Plaintiff's] dick off." Doc. 149, Ex. 2, Larson Dep. at ¶ 15. Defendants objected to the Court considering this statement on hearsay grounds. Plaintiff asserts that it is not hearsay as she is an employee of the Defendants. Doc. 157 at 27; Doc. 171-1 *citing* Sept. 18, 2019 (Vol. II) Tr. at 203:13-15. "An employee's statements are not attributable to [her] employer as a party-opponent admission in an employment dispute unless the employee was 'involved in the decision-making process affecting the employment action' at issue." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1208–09 (10th Cir. 2010), *Jaramillo v. Colo. Judicial Dep't,* 427 F.3d 1303, 1314 (10th Cir. 2005) (per curiam). Here, Plaintiff has not

---

[9] Plaintiff was terminated on August 27, 2018. Ms. Van Meter's deposition was taken on June 19, 2019. The next day Ms. Van Meter submitted corrections to the deposition stating that she kissed Mr. Dillenback. After Plaintiff was terminated, the Peer Review Panel held its hearing in September 2019 and issued its decision in November 2019.

established by citation to the record how Chamiza Pacheco de Alas was involved in the decision-making process. Ms. Pacheco de Alas was not a decisionmaker in the any of the employment decisions, including (1) the PLOD; (2) Dr. Stokes's letter finding a hostile work environment; (3) Dr. Roth's disciplinary action, or (4) the Peer Review Panel. Nor has he shown that she in fact influenced any of those decisions. Therefore, her statements are inadmissible hearsay.

Plaintiff's next theory is that the OEO concluded Ms. Van Meter would not engage in sexual activity with Plaintiff because she is a mother. But Plaintiff does not point to where in the record that conclusion was made. *See* Doc. 148 at 40. Rather, the PLOD considered the likelihood of Ms. Van Meter voluntarily becoming intoxicated when she was expected to care for her child that evening while her husband went to work.

To the extent Plaintiff points to inconsistencies in Ms. Van Meter's story, his summary judgment briefing does not adequately identify the alleged inconsistencies or show (by citation to the record) that her version was contrary to other witnesses' testimony. *See* Pl.'s Resp., Doc. 148 at 41. Even assuming there were inconsistencies or incoherencies, Defendants reasonably relied on other evidence. It is undisputed that she was unresponsive to oral sex; the SANE report noted physical evidence consistent with nonconsensual sexual assault; she vomited; she attempted to text her husband to pick her up but instead texted a friend in Maine; Plaintiff's own text messages suggest she drank too much; and she asked Plaintiff to drive her home as she could not drive herself. Moreover, her husband noted she was so intoxicated when she arrived that he would not allow her to watch their child while he went to work.

Beyond undermining Ms. Van Meter's story, Plaintiff attempts to show procedural irregularities by citing to Dr. Larson's Declaration that Defendants failed to follow their own policies in imposing discipline. Dr. Larson was Plaintiff's direct supervisor. He gave Plaintiff

exemplary reviews and ultimately recused from disciplining Plaintiff. A meeting was held between Dr. Larson and various administrators, including HR administrator Dorothy Anderson, to explain the process of sanctioning and to answer any questions he had about the case. Dr. Larson Dep., Doc. 156-1 at 27:14-16. At the meeting, Dr. Larson stated that (1) he did not have the exhibits and evidence used to support the findings in the PLOD and (2) he felt he did not have clear documentation setting forth the policy violation and the findings, as he did not know if he was sanctioning the matter for a hostile work environment or for sexual misconduct of a severe type. Doc. 156-1 at 27:20-28:1. He stated that his concern was that he did not have a document which set forth the finding. Dr. Larson Dep. at 28:18-25. He stated that he was concerned "if I sanctioned him without clear documentation of what the finding was and what the violation was, that I would personally be liable to a suit from Mr. Briggs." Doc. 156-1 at 30:18-21. He therefore asked for more documentation, noting: "I had decided that if I could not get clear documentation, I did not think it was appropriate for me to take on either an action or the legal risk of doing so." *Id.* at 31:2-5, 32:9-12. Defendants appear to admit that he should have been provided these documents. However, the PLOD and Dr. Stokes's letter when read together were clear regarding the findings and conclusions. Ultimately, the failure to provide the evidence to Dr. Larson underlying the 28-page PLOD does not demonstrate bias, especially since his disciplinary role was not to reweigh the evidence or come to his own conclusions regarding the violation of policy. *See* Roth Dep., Doc. 149 at 43.

Although Dr. Larson testified that he recused because he wanted to avoid legal liability, he stated that it did not mean that he believed the process was biased or flawed. Larson Dep., Doc. 146-2 at 28:2-16. He stated that his only concern was that he wanted a document that identified the findings against Plaintiff and the polices violated. *Id.* at 28:18-25. Dr. Larson

provided a new declaration after his employment ended with UNM, which states he believed the process was biased and unfair. However, as explained above, these statements are directly contrary to his deposition testimony and will not be considered. Larson Dep., Doc. 156-1 at 28:15-16.

Dr. Larson's declaration also states that he was misled into believing that Plaintiff did not contest the findings in the PLOD. Doc. 148 at 44. Defendants argue, and the Court agrees, that such statement does not change the analysis. Plaintiff did not appeal the PLOD's findings, and he admitted to certain factual allegations which could be construed as sexual assault.

Plaintiff also argues a procedural irregularity exists because Dr. Roth was pressured to terminate Plaintiff. After Dr. Larson recused, Dr. Roth was tasked with imposing discipline. Dr. Roth explained that he did not request the evidence underlying the PLOD's factual findings because his job "was not to reassess the investigation nor re-evaluate it, but simply take the results of the investigation and the appeal as fact and then come to a determination of what the disciplinary action should be." *See* Roth Dep., Doc. 149 at 43

Dr. Roth further stated that he met with administrators "to understand what my role was at that point in time and understanding the options that were available to me as far as sanctioning was concerned." Doc. 157-1 at Exhibit A at 4, Sept. 18, 2019 Tr. at 204:17-24. Dr. Roth testified that administrators believed that termination was the most reasonable option in response to the sexual assault of a fellow UNM employee. Doc. 149 at 44; Roth Dep. at 99:6-25. Administrators explained that similar cases resulted in termination and termination was the most reasonable option to remain consistent with university practice. Doc. 157-1, Exhibit A at 5, Sept. 18, 2019 Tr. at 207:4-19. He stated that he was considering lesser sanctions in light of Plaintiff's work history. Doc. 149 at 44, Roth Dep. at 99:6-25. He stated that he asked administrators to consider

an alternative discipline, which he believed they were willing to do. Doc. 149 at 49; Roth Dep. at 156:2-20. But Dr. Roth testified that he concluded "that termination was the only viable option." Roth Dep. at 98:8-14. Dr. Roth believed an accelerated disciplinary process was warranted given the serious and egregious nature of the policy violation by Plaintiff. Doc. 157, Ex. A, Sept. 18, 2019 Tr. at 201:19-25. He also noted that Plaintiff did not take any responsibility for his actions. Doc. 149 at 50; Roth Dep at 159:5-7. Moreover, Dr. Roth concluded that the victim lacked the capacity to consent in part based on Plaintiff's factual admissions. Doc. 157-1, Exhibit A at 6, Sept. 18, 2019 Tr. (Vol. II) at 214:15-22. This process described by Dr. Roth in his testimony does not evidence such irregularities as to find bias or to doubt the outcome of the disciplinary proceeding. On the contrary, the uncontroverted facts show that Defendants put a substantial amount of time, consideration, and process into deciding whether to terminate an employee in light of credible, well-substantiated evidence that he sexually assaulted a fellow employee.

Plaintiff next asserts that Defendant Anderson's involvement in recommending discipline to Dr. Larson and Dr. Roth was inappropriate. However, Ms. Anderson was the head of the labor relations staff, who *are* involved in recommending discipline. Plaintiff points to no evidence that her involvement was unusual or that it violated policy. Moreover, Defendant Anderson pointed to other examples of her involvement in disciplining high-level employees, which shows that Plaintiff was not treated differently. Anderson Dep, Doc. 149, at 55:6-15; 56:2-10. Dr. Roth testified that he believed termination was appropriate, and he stated that Ms. Anderson advised him as to his role in the sanctioning process. Roth Dep., Doc. 157-1, 9/1/19 Tr., at 204:17-24, 195:20-23.

Plaintiff generally asserts the investigation was procedurally deficient because Defendants did not promptly collect or preserve evidence. Doc. 148 at 18, ¶ pp.  But Plaintiff fails to assert what specific evidence was not collected. Moreover, the PLOD shows that Defendants collected and preserved evidence, including testimony and documentary evidence. PLOD, Doc. 129-2 at 3. To the extent he asserts Defendants did not *timely* investigate, he does not point to how any untimeliness passes doubt on the outcome of the investigation.

Plaintiff also criticized President Stokes's determination that the sexual assault, which happened outside of work, created a hostile work environment at the office.  President Stokes set forth the evidence on which she based her decision. Doc. 129-6.  Plaintiff held a high-level position which afforded him the opportunity to be influential at the department level.  The OEO found it was reasonable that Ms. Van Meter would be concerned about Plaintiff's potential negative influence in her work environment, considering Plaintiff's longevity and level of authority at UNM. Doc. 129-2 at 25.  Moreover, Plaintiff and Ms. Van Meter received some of the same emails, letters, and memorandum, which made her work life difficult after the assault. Doc. 129-6 at 1.  Finally, Ms. Van Meter and Plaintiff agreed in a protection order that incidental contact would not constitute a violation of the order; the necessity of such an exception provides evidence that the parties worked in close proximity. Doc. 129-7 at 3, ¶ 4.

Plaintiff goes on to attack the next step of the disciplinary process, *i.e.*, the post-termination proceeding. Plaintiff challenged Dr. Roth's decision terminating him, which went to a post-termination hearing before a three-person Peer Review Panel. The Peer Review Panel held a three-day evidentiary hearing, heard testimony, and considered documentary evidence. It issued an eight-page decision, concluding that Ms. Van Meter lacked the capacity to consent. Plaintiff asserts that the post-termination proceeding was flawed or biased because (1) neither he

nor Ms. Van Meter were permitted counsel, (2) he had to provide written cross-examination questions to the panel, which would pose the questions to Ms. Van Meter; and (3) he had the burden of proof.  Defendants prohibited counsel from speaking on behalf of both Ms. Van Meter and Plaintiff at the three-day hearing, but they were allowed to have the assistance of counsel during the hearing. Doc. 148 at 7, ¶ 11. Plaintiff did not assert in his response to the motion for summary judgment whether the panel prevented him from asking any questions, and which questions (if any) were unanswered.  *See* Doc. 148 at 7-8.

In addition, switching the burden to Plaintiff in *post-termination* proceedings was not irregular given that he had the opportunity to be heard in pre-termination hearings, including the right to submit evidence, and he was terminated only if it was found by a preponderance of the evidence that he violated UNM policies.  *Benavidez v. City of Albuquerque*, 101 F.3d 620, 627 (10th Cir. 1996) (switching burden to employee in post-termination proceeding was not a due process violation given prior pre-termination proceedings).

Plaintiff appears to assert that Defendants did not follow their progressive discipline policy because his exemplary performance reviews were not enough to overcome a finding of sexual assault. However, where (as here) "progressive discipline [is] entirely discretionary ..., the failure to implement progressive discipline is not evidence of pretext." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007), *quoted in Montoya v. Jacobs Tech., Inc.*, 764 F. App'x 830, 835–36 (10th Cir. 2019). The disciplinary policy states that although the university normally uses a progressive discipline process, some violations may be of such a serious nature that immediate suspension or termination is appropriate, such as creating a hostile work environment, discrimination, sexual harassment, misconduct, and violation of university policies. Cordova Dec. Ex. A-9, Doc. 129-10 at 4. Defendants reasonably concluded that penetrative

sexual assault was severe conduct. Doc. 129-10 at 4. Dorothy Anderson explained to Dr. Roth that termination was reasonable, as Defendants terminated employees for similarly severe conduct.

To the extent Plaintiff *generally* cites to Damon Fay's expert report to show procedural irregularities in UNM's disciplinary process, such information does not change the result. Mr. Fay is a former police officer at the Albuquerque Police Department. Plaintiff does not cite to any *particular portions* of Fay's report to support a particular asserted fact or cite to it in his analysis to explain how it establishes a material fact, such as specific procedural irregularities or deficiencies. *See* Pl.'s Resp., Doc. 148 at 4, 18. A party must cite to "particular parts of material in the record" to support or contest a fact, Fed. R. Civ. P. 56(c)(1), and the Court need only consider the cited materials. Fed. R. Civ. P. 56(c)(3). Plaintiff does not address or explain how Mr. Fay's report creates a genuine dispute of material fact. *See* Doc. 148 at 34-46.

In sum, Plaintiff's arguments generally did not demonstrate a procedural irregularity or deficiency. To extent he did show an irregularity or deficiency, it was not substantial and does not cast doubt on the outcome of the proceedings.

4. Plaintiff's summary is insufficient to rule out other, non-gender related reasons for alleged discipline disparities.

Finally, Plaintiff relies heavily on two declarations which summarize 371 disciplinary files as evidence that UNM is biased against men. The Court concludes that Mr. Allen's and Plaintiff's Rule 1006 declarations are insufficient to create an inference of gender bias, as they are too generalized or simplistic to eliminate obvious nondiscriminatory explanations for the disparity. "[A]t least in the discrimination context, the extent to which a discriminatory motive may be reasonably inferred from evidence of statistical disparity often depends on the evidence's

ability to eliminate obvious nondiscriminatory explanations for the disparity." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1194 (10th Cir. 2020) (*"Doe I"*), quoting *Luster v. Vilsack*, 667 F.3d 1089, 1094 (10th Cir. 2011); *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1147 (10th Cir. 2009) (same); *Schulte v. Potter*, 218 F. App'x 703, 714 (10th Cir. 2007) (explaining that, where evidence "wholly fail[s] to eliminate nondiscriminatory explanations for" disparate treatment, "[i]t would be unreasonable to draw an inference of" intentional discrimination (internal quotation marks omitted)).

For example, in *Doe I,* certain statistical evidence failed to create an inference of gender bias as it failed to rule out other explanations for the disparate treatment. The *Doe I* statistics appeared to go beyond merely the number of complaints made against male or female respondents. Rather, it included statistical evidence regarding "the numbers of men and women expelled from [the university] for engaging in non-consensual sexual contact involving penetration." *Doe I,* at 952 F.3d at 1199.

Mr. Allen's declaration summarizes his review of the disciplinary records and performs basic arithmetic. He reviewed 371 disciplinary files which arose after allegations of sexual harassment or sexual misconduct. Of the 269 complaints made against male respondents, 126 (or 46.8%) were investigated by the OEO. Of the 102 complaints made against female respondents, 7 (or 6.9%) were investigated by the OEO. Based on these numbers, Mr. Allen calculated that male respondents were investigated by the OEO "at a rate 6.8 times greater than female respondents." Doc. 149, Exhibit 1, at 4.

Moreover, after viewing each file, he noted that of the 269 complaints against male respondents, 78 (or 29%) resulted in a finding of a policy violation against the male respondent. Of the 102 complaints made against female respondents, only 1 (or less than 1%) resulted in a

policy violation against the female respondents. However, only seven complaints were investigated against women. He notes that two of the complaints against women were referred to hearings, and he does not know the outcome of those hearings.  Doc. 149, Exhibit 1 at 6. The declarations did not distinguish between employees and students.

Here, Plaintiff was accused of penetrative sexual assault of a fellow employee. However, Plaintiff's summary consists of general complaints for sexual misconduct or sexual harassment. Doc. 149 at 4, ¶ 3. The declarations do not define the phrase "sexual misconduct or sexual harassment." *Id.*  It could involve a wide variety of less serious conduct, some of which is not actionable under Defendants' policies.  Defendants clearly viewed the accusation, penetrative sexual assault, to be severe and worthy of investigation and discipline. As explained above, the summary does not provide details on how many of the complaints involved accusations of penetrative sexual assault or similarly severe conduct, the nature of the complaints, the reasons why complaints were investigated or not investigated, and the types of punishment for similarly severe charges. *See, e.g., Doe v. Univ. of Denver*, 952 F.3d 1182, 1194 (10th Cir. 2020) (noting that data should eliminate non-discriminatory reasons for statistical disparities, such as "that male students on average ... committed more serious assaults"). Thus, it is unclear whether men and women were accused of similar conduct and whether similar conduct was similarly investigated and punished. For example, the Court cannot discern whether the complaints involved serious offenses like rape versus offenses involving inappropriate jokes or the failure to promote an employee.  Without an accurate basis for comparison, the statistical evidence does not rule out non-discriminatory reasons for the statistical disparities. Therefore, it does not provide evidence of gender bias.

Alternatively, even assuming the statistics could provide some evidence of gender bias, this alone is not sufficient to establish a *prima facie* case or to establish that Defendants' legitimate business reason for the adverse action was pretextual. *Doe II* concluded that (1) statistical evidence of bias against men in disciplinary proceedings, (2) combined with an "egregious" investigation "replete" with procedural irregularities and strong reasons to doubt the alleged victim's story, created a genuine dispute of material fact defeating summary judgment. *Doe v. Univ. of Denver*, 1 F.4th 822, 831-32, n.13 (10th Cir. 2021). The Tenth Circuit noted that the irregularities in *Doe* II were greater than in *Doe I*, implying that the degree of irregularity matters. *Id.* at 832 n.13. Here, there were not substantial procedural irregularities or deficiencies, or substantial reasons to doubt the outcome of the disciplinary proceedings as in *Doe II*. Moreover, unlike in *Doe II*, the victim's story here is strongly corroborated by text messages, interviews, physical injuries, the SANE examination, and Plaintiff's own statements.

For all of these reasons, Plaintiff has not established a prima facie case for sex discrimination under the first step of the *McDonnell Douglas* burden-shifting framework.

### B.    Defendants had a legitimate business reason for terminating Plaintiff.

The second step of the *McDonnell Douglas* framework requires the defendant "to articulate a legitimate, nondiscriminatory reason for the adverse action." *Bird v. W. Valley City*, 832 F.3d 1188, 1200 (10th Cir. 2016). Plaintiff does not appear to challenge that Defendants established legitimate business reasons for his termination. Defendants assert that there are facts supporting each decision in the process, including (1) the OEO's conclusion that the sexual activity was nonconsensual; (2) President Stokes's decision that the sexual assault created a hostile work environment; (3) Dr. Roth's termination decision; and (4) the Peer Review Panel's

affirmance. *See* Doc. 129 at 17-19. The Court agrees and concludes that Defendants have satisfied their burden by asserting nondiscriminatory reasons for terminating Plaintiff.

### C.    Plaintiff failed to show pretext.

Plaintiff bears the burden of showing that there is a genuine dispute of material fact as to whether the proffered reasons for the termination are pretextual. "A pretext argument requires the court to examine the facts as they appear to the person making the decision, to determine whether the employer honestly believed those reasons and acted in good faith upon those beliefs." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1220 (10th Cir. 2007) (internal quotation marks and citations omitted). "The plaintiff may establish pretext by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1267 (10th Cir. 2015) (internal quotation marks omitted). Thus, the Court does not determine whether the Defendant's decisions were correct, rather only "whether the employer honestly believed its reasons and acted in good faith upon them." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1220 (10th Cir. 2007). Evidence of pretext often includes but is not limited to: (1) evidence that a defendant's stated reason was false; (2) evidence that a defendant was acting contrary to company policy; and (3) evidence that the plaintiff was treated differently from similarly situated employees. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307–08 (10th Cir. 2017).

At this stage in the *McDonnell Douglas* analysis, whether Plaintiff in fact sexually assaulted Ms. Van Meter is not at issue. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000), *citing McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th

Cir.1998) (finding that plaintiff failed to establish pretext where the defendant discharged plaintiff after conducting an investigation into a subordinate employee's allegations of sexual misconduct on the part of the plaintiff and believed the allegations to be true, even though plaintiff presented evidence to the district court that the allegations may have been false). "This court's function is not to second guess business decisions made by employers, and our inquiry is not whether [Defendants'] decision to fire [Plaintiff] was ultimately correct or wise." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 463 (10th Cir. 2013) (internal quotation marks omitted), *quoted in Montoya v. Jacobs Tech., Inc.*, 764 F. App'x 830, 835 (10th Cir. 2019). "Evidence that the employer should not have made the adverse employment decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (brackets and internal quotation marks omitted). Rather, at issue is the sincerity of the employer's proffered belief for the termination. *See Berry v. T-Mobile USA, Inc*., 490 F.3d 1211, 1220 (10th Cir. 2007) ("[A]t issue is whether the evidence of Plaintiff's misconduct presented to [the decisionmakers] was so weak that a rational factfinder could infer that [the] expressed reason for terminating Plaintiff must have been pretextual.") (internal quotation marks omitted).

The Court extensively discussed the evidence presented in the summary judgment briefing in deciding whether Plaintiff stated a *prima facie* case. For the reasons stated above, which the Court incorporates herein, the Court also concludes that the record contains no evidence from which a reasonable fact finder could conclude that Defendants' stated reasons for terminating Plaintiff were pretextual.

First, as explained above, Plaintiff's evidence of external pressure from the DOJ and news articles was gender-neutral, and does not establish that Defendants' proffered reasons are pretextual.

Second, Plaintiff has not demonstrated an erroneous outcome in the various disciplinary proceedings. There is nothing to indicate weakness, implausibility, or inconsistencies in Defendants' reasons for firing Plaintiff. Moreover, there is no reason to doubt the sincerity of Defendants' proffered belief for the termination, *i.e.,* that Ms. Van Meter lacked the capacity to consent to sexual activity, that Plaintiff sexually assaulted her, and such sexual assault created a hostile work environment. Ms. Van Meter's story was consistent and coherent, and her story was supported by other evidence, including certain factual admissions by Plaintiff, text messages, a SANE Report, and Ms. Van Meter's husband's testimony regarding her condition when she arrived home. Defendants reasonably relied on this other evidence, even assuming her story were inconsistent or incoherent. Although Plaintiff tells a different story, the record does not reflect that Defendants' decision was pretextual. Moreover, as expressly stated in Policy 2730 and cited in the Peer Review Panel decision, a single severe act, such as sexual assault, may be sufficient to create a hostile work environment.

As discussed in detail above, Plaintiff has generally not demonstrated Defendants acted contrary to UNM policy or shown substantial procedural irregularities/deficiencies. To the extent he has demonstrated some irregularities or deficiencies, they do not cast doubt on the outcome of the disciplinary proceedings or show that the decisions were pretextual.

Finally, Plaintiff points to certain statistics to show he was fired for sexual assault because he is a man. As explained above, the statistics are too generalized to rule out non-gender related explanations for the disparities between investigations of men and women. "[S]howing

disparate treatment—by demonstrating that the employer treated employees similarly situated to the plaintiff employee differently (i.e., more favorably)—is a particularly potent instrument to discredit an employer's allegedly legitimate reasons." *Dewitt v. Southwestern Bell Telephone Co.*, 845 F.3d 1299, 1311 (10th Cir. 2017). Here, as explained above, Plaintiff presents calculations regarding the number of men and women accused of, investigated for, and disciplined for, "sexual misconduct or sexual harassment." Allen Decl., Doc. 149 at 4, ¶ 3. But the declarations do not define what that phrase means, and it could include a wide variety of conduct ranging from rape to a compliment about appearance. Plaintiff has not demonstrated how many women were accused of penetrative sexual assault or similarly severe acts, or why those cases were not pursued. As explained in *Doe I,* Plaintiff has the burden of submitting statistical evidence which eliminates non-discriminatory explanations for statistical differences in the treatment of men and women. *Doe v. Univ. of Denver*, 952 F.3d 1182, 1194 (10th Cir. 2020). It is not clear from the calculations whether men and women were accused of similarly severe misconduct. Rather, the tables lump together general sexual misconduct or harassment which is not defined in the declarations. Thus, the statistics do not show that Defendants treated employees or students similarly situated to each other differently.

Even assuming Plaintiff's summaries show sex bias, as explained above, Plaintiff has not demonstrated substantial procedural irregularities or reasons to doubt the outcome of the disciplinary proceeding as in *Doe II. Doe v. Univ. of Denver*, 1 F.4th 822, 831-32, n.13 (10th Cir. 2021). The Court also notes that the totality of the evidence undermines Plaintiff's theory that he suffered discrimination because he is a man or that he was unfairly targeted by female

administrators.[10] The undisputed evidence instead shows he was given the benefit of the doubt before his termination. Plaintiff's direct supervisor – a high-level male employee who provided exemplary reviews – recused and is now willing to submit an affidavit to support his claim. Dr. Roth - another high-level male employee - explored the possibility of lesser sanctions before ultimately concluding that the credible, well-substantiated claim of penetrative sexual assault must result in termination. The Peer Review Panel included both men and women.

For these reasons, Plaintiff has not shown pretext under the *McDonnell Douglas* framework. Defendants are entitled to summary judgment in their favor on Plaintiff's Title IX claim (Count II).

**III.    Title VII claim (Count III) against individual Defendants is dismissed.**

The individual Defendants assert that Plaintiff may not assert a Title VII claim against them, which Plaintiff now concedes. *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1083 n.1 (10th Cir. 2007) ("Under long-standing circuit precedent, supervisors and other employees may not be held personally liable under Title VII."). Therefore, the Court dismisses the Title VII claim (Count III) brought against the individual Defendants.

**IV.    Title VII claim (Count III) against the entity Defendants for the same reasons as above.**

Moreover, the Court enters summary judgment in the entity Defendants' favor on the Title VII claim, for the same reasons the Court enters summary judgment on the Title IX claim. Plaintiff has not created a genuine dispute of material fact that his sex was a motivating factor in

---

[10] The Court is aware that a person may assert a discrimination claim even when the decisionmaker is of the same protected class. But Plaintiff theorizes in his brief that he was repeatedly targeted by *female* administrators because he was male. But the record shows that men also concluded that he sexually assaulted Ms. Van Meter because she was not capable of consenting.

his termination. Defendants asserted that his Title VII claim may be rejected for the same reason as his Title IX claim, specifically that there is no evidence of pretext to overcome Defendants' legitimate, nondiscriminatory reasons for his termination. Defs'. Mot. Summ. J., Doc. 129 at 24. Plaintiff did not specifically respond to this argument (*i.e.,* that the Title IX and Title VII claims can be addressed together).

As to his Title VII claim, Plaintiff asserts that he was terminated based in whole or in part on sex-based discrimination. Compl., Doc. 1 at ¶ 173 ("Defendants' termination of Plaintiff [was] based in whole or in part on sex-based discrimination"). Similarly, under his Title IX claim (Count II), Plaintiff alleged that he was discriminated against on the basis of his sex. Compl., Doc. 1 at ¶¶ 137, 142, 144.

"Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an individual 'because of such individual's ... sex.'" *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017), *quoting in part* 42 U.S.C. § 2000e–2(a)(1). "Title IX of the Education Amendments Act of 1972 provides similar protections. It prohibits discrimination 'on the basis of sex' in educational programs or activities receiving federal funding." *Hiatt*, 858 F.3d at 1315, *quoting in part* 20 U.S.C. § 1681(a). "Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001); *see also Roberts v. Colorado State Bd. of Agric.,* 998 F.2d 824, 832 (10th Cir.1993) (Title VII is "the most appropriate analogue when defining Title IX's substantive standards"); *Doe v. Univ. of Denver*, 952 F.3d 1182, 1197 (10th Cir. 2020) (applying Title VII standards to Title IX issue).

In a case where an employee of the University of Denver challenged certain adverse employment actions on the basis of sex discrimination, the Tenth Circuit analyzed the Title VII

and Title IX claims together under the *McDonnell Douglas* burden-shifting framework. *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017). The Court finds this approach useful here.  As explained above, the Court concluded that Plaintiff failed to show that his sex was a motivating factor in his termination, or that Defendants' legitimate reasons for the termination were pretextual. Plaintiff has not identified any relevant distinction between the Title VII and Title IX claims, and the Court sees no relevant distinction here. Under these circumstances, the Court finds that the same extensive analysis above also applies to Plaintiff's Title VII claim. Therefore, the Court enters summary judgment and dismisses Plaintiff's Title VII claim (Count III) against Defendants UNM and UNM Board of Regents.

**V.    <u>Court enters summary judgment on Plaintiff's NMHRA claim (Count III).</u>**

Defendants assert that the Court should enter summary judgment on the NMHRA claim (Count III) for the same reasons the Court entered summary judgment on the federal claims, *i.e.*, that Plaintiff failed to show that Defendants' legitimate, non-discriminatory reason for firing Plaintiff was a pretext. Doc. 129 at 24. Defendants moved for summary judgment on behalf of both the entity and individual Defendants. Doc. 129 at 20 (noting there is no evidence that Defendants Vele Buchs's, Stokes's, Roth's, or the peer review panel's employment decisions were pretextual or weak, implausible, inconsistent, or incoherent); Doc. 129 at 24. Plaintiff did not respond or explain whether there are any relevant differences between the federal claims and the NMHRA claim which would preclude summary judgment.

The Tenth Circuit instructs that cases brought pursuant to the New Mexico Human Rights Act may be analyzed under the *McDonnell Douglas* burden-shifting framework where there is an absence of direct evidence of discrimination. *Perry v. Woodward*, 199 F.3d 1126, 1141 (10th Cir. 1999). New Mexico courts "look for guidance to interpretations of federal employment

discrimination law under Title VII." *Garcia v. Hatch Valley Pub. Sch.*, 2018-NMSC-020, ¶ 17, 458 P.3d 378, 384.  Both the NMHRA and Title VII prohibit discrimination on the basis of sex. As in the federal claims, Plaintiff has the burden on summary judgment to present evidence that Defendants' nondiscriminatory reason for termination "was pretextual or otherwise inadequate." *Garcia*, 2018-NMSC-020 at ¶ 28.

Here, Plaintiff has not pointed to any relevant distinctions between the NMHRA claim and the federal claims which would preclude summary judgment for the reasons discussed above. As explained above, the Court concludes that Plaintiff has not carried his summary judgment burden and demonstrated pretext, nor has he demonstrated that his sex was a motivating factor in his termination.  Defendants (except Defendant Gick) are therefore entitled to summary judgment on Plaintiff's NMHRA claim (Count III).  Having determined Count III is not viable, the Court declines to reach Defendants' argument that the NMHRA claim should also be dismissed under the higher federal standard applicable to "reverse discrimination" cases.

## VI.  <u>Declaratory judgment and injunctive relief claims are dismissed</u>.

Defendants assert that the Court should dismiss the injunctive and declaratory relief claims (Counts X and XI) if the remaining employment discrimination claims fail.  Doc. 129 at 25.  Plaintiff did not assert in his response that the claims should survive if his employment discrimination claims fail. Plaintiff did not allege any independent basis for declaratory relief separate from those which have already been dismissed. *Gutwein v. Taos Cnty. Det. Ctr. ("TCDC")*, No. 1:15-CV-00672 RB-WPL, 2017 WL 3610532, at *9 (D.N.M. Feb. 24, 2017). Therefore, as explained below, the declaratory and injunctive relief claims are dismissed.

Under New Mexico law, the Declaratory Judgment Act is a special proceeding that grants the state district courts the "power to declare rights, status and other legal relations whether or

not further relief is or could be claimed." N.M. Stat. Ann. § 44-6-2 (1975). In an action seeking declaratory relief, the plaintiff must establish: "a controversy involving rights or other legal relations of the parties seeking declaratory relief; a claim of right or other legal interest asserted against one who has an interest in contesting the claim; interests of the parties must be real and adverse; and the issue involved must be ripe for judicial determination." *State ex rel. Stratton v. Roswell Indep. Sch.*, 806 P.2d 1085, 1096 (N.M. Ct. App. 1991) (quoting *Chronis v. State ex rel. Rodriguez*, 670 P.2d 953, 958 (N.M. 1983)).

Similarly, "the Declaratory Judgment Act does not provide an independent federal cause of action." *Nero v. Oklahoma*, No. 22-6121, 2022 WL 14423872, at *2 (10th Cir. Oct. 25, 2022), *citing Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671–74 (1950) (describing "limited procedural purpose of the Declaratory Judgment Act"). It merely empowers a court "[i]n a case of actual controversy within its jurisdiction" to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." § 2201(a). In other words, the Act "enlarge[s] the range of remedies available in the federal courts," *Skelly Oil Co.*, 339 U.S. at 671, but it leaves "substantive rights unchanged," *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959).  Therefore, "[t]o maintain an action for a declaratory judgment, then, [Plaintiff] must assert a valid federal cause of action—one that exists independent of any request for declaratory relief." *Nero v. Oklahoma*, No. 22-6121, 2022 WL 14423872, at *2 (10th Cir. Oct. 25, 2022).

Here, the Court has dismissed all substantive claims for relief or entered summary judgment in Defendants' favor. As no independent controversy remains, Plaintiff is not entitled to the requested declaratory relief. *See Stratton*, 806 P.2d at 1096; *Chronis*, 670 P.2d at 958.

As to an injunction, such relief is a remedy, not an independent cause of action. Because all independent causes of action have been dismissed, the Court also rejects Plaintiff's claim for injunctive relief.

Thus, Counts X and XI for injunctive and declaratory relief are dismissed.

**VII.** **Plaintiff's Motion for Leave to Identify Statistical Expert.**

Plaintiff moves for leave to identify Mr. Allen as an expert for use *at trial*. Doc. 154. Plaintiff does not seek leave to identify Mr. Allen as an expert for consideration in the summary judgment motion, although the Court has considered Mr. Allen's non-expert summary declaration as part of this proceeding. Because the Court grants the summary judgment motion, Plaintiff's request to designate a trial expert is denied as moot.

## CONCLUSION

For the reasons stated above, the Court finds that Plaintiff has not created a genuine dispute of material fact that his sex was a motivating factor in his termination from UNM, or that the reasons for his termination were pretextual. Therefore, the Court enters summary judgment in favor of the remaining Defendants and against Plaintiff on the remaining claims, the Title IX claim (Count II), the Title VII and the NMHRA claims (Count III), the request for declaratory relief (Count XI), and the request for injunctive relief (Count X).

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss and for Summary Judgment **(Doc. 129)** is **GRANTED** for the reasons described in this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Plaintiff's Summary Judgment Evidence **(Doc. 146)** is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Extension of Time to Respond to Defendants' Motion to Strike (**Doc. 150**) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Opposed Motion for Leave to Identify Statistical Expert For Use At Trial (**Doc. 154**) is **DENIED AS MOOT.**

/S/
_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE

**CASE NO. 25-2068**

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

MICHAEL BRIGGS,

      Plaintiff-Appellant,

v.

THE UNIVERSITY OF NEW MEXICO, a public university, THE BOARD
OF REGENTS OF THE UNIVERSITY OF NEW MEXICO, GARNETT
STOKES, individually and in her official capacity, PAUL B. ROTH,
individually and in his official capacity, DOROTHY ANDERSON,
individually and in her official capacity, LAURA VELE BUCHS,
individually and in her official capacity, and KEVIN GICK, individually and
in his official capacity,

      Defendants-Appellees.

---

On Appeal from the United States District Court
For the District of New Mexico
The Honorable Kea W. Riggs
District Court Case No. 20-cv-00651 KWR-JMR

---

**ATTACHMENT 2 TO APPELLANT'S OPENING BRIEF**
**District Court Order Filed September 22, 2021 [Doc. No. 39]**

---

Travis G. Jackson
Jackson Loman Downey & Stevens-Block, P.C.
201 3rd St. NW, Suite 1500
Albuquerque, New Mexico 87102
Telephone (505) 767-0577
travis@jacksonlomanlaw.com

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MICHAEL BRIGGS,

       Plaintiff,

vs.                                                                                     No. CIV 20-0651 JB/JHR

THE UNIVERSITY OF NEW MEXICO, a
public university; THE BOARD OF REGENTS
OF THE UNIVERSITY OF NEW MEXICO;
GARNETT STOKES, individually and in her
official capacity; PAUL B. ROTH, individually
and in his official capacity; DOROTHY
ANDERSON, individually and in her official
Capacity; LAURA VELE BUCHS, individually
and in her official capacity and KEVIN GICK,
individually and in his official capacity.

       Defendants.

## <u>ORDER</u>[1]

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion to Dismiss

Plaintiff's Claims for Due Process Violations (Count I), filed November 4, 2020 (Doc. 11)("Due

Process MTD"); (ii) the Defendants' Motion to Dismiss Plaintiff's Title IX Claim (Count II), filed

November 4, 2020 (Doc. 12)("Title IX MTD"); (iii) the Defendants' Motion to Dismiss Plaintiff's

Claims the Tort Claims Act (Counts I-IX), filed November 4, 2020 (Doc. 14)("NMTCA MTD");

and (iv) the Defendants' Motion to Dismiss Plaintiff's Discrimination Claims Brought Under the

---

[1] This Order disposes of (i) the Defendants' Motion to Dismiss Plaintiff's Claims for Due Process Violations (Count I), filed November 4, 2020 (Doc. 11); (ii) the Defendants' Motion to Dismiss Plaintiff's Title IX Claim (Count II), filed November 4, 2020 (Doc. 12); (iii) the Defendants' Motion to Dismiss Plaintiff's Claims the Tort Claims Act (Counts I-IX), filed November 4, 2020 (Doc. 14); and (iv) the Defendants' Motion to Dismiss Plaintiff's Discrimination Claims Brought Under the New Mexico Human Rights Act (Count III) for Lack of Personal Jurisdiction, filed November 4, 2020 (Doc. 16). The Court will issue at a later date, however, a Memorandum Opinion more fully detailing its rationale for this decision.

New Mexico Human Rights Act (Count III) for Lack of Personal Jurisdiction, filed November 4, 2020 (Doc. 16)("NMHRA MTD").  The Court held a hearing on August 24, 2021.  See Clerk's Minutes, filed August 24, 2021 )(Doc. 38).  The primary issues are (i) whether Plaintiff Michael Briggs pled sufficiently a violation of his due process rights against persons under 42 U.S.C. § 1983; (ii) whether Briggs has pled sufficient facts to allege that Defendant University of New Mexico's investigative process of the sexual assault claim against him was discriminative based on Briggs' gender; (iii) whether the Defendants fall within the medical facility or law enforcement officer waiver of sovereign immunity in the New Mexico Torts Claim Act ("NMTCA"), N.M.S.A. §§ 41-1-1 through 41-4-29; (iv) whether Briggs followed the proper administrative procedures to sufficiently allege a violation of the New Mexico Human Rights Act ("NMHRA"), N.M.S.A. § 41-28-1.  The Court concludes that: (i) Briggs has not pled sufficiently a violation of his due process rights; (ii) the individual defendants cannot be held liable under Title IX, but Briggs pleads sufficient facts to allege that UNM's investigative process discriminated him because of his gender; (iii) the Defendants neither operated a medical facility nor acted as law enforcement officers, so they are not liable under the NMTCA; and (iv) Briggs does not plead sufficiently a claim against Gick under the NMHRA, but pleads sufficient facts for a claim against the remaining Defendants.  Accordingly, the Court will: (i) grant the Due Process MTD and dismiss Count I with prejudice; (ii) grant the Title IX MTD with respect to the individual defendants Stokes, Roth, Anderson, Buchs, and Gick and dismiss Count II with prejudice with respect to the individual defendants, and deny the Title IX MTD with respect to the UNM and the UNM Board of Regents; (iii) grant the NMTCA MTD and dismiss claims IV-IX with prejudice; and (iv) grant the NMHRA MTD with respect to Gick and dismiss Count III with prejudice with respect to Gick, and deny the NMHRA with respect to UNM, UNM Board of Regents, Stokes, Roth, Anderson, and Buchs.

**PROCEDURAL BACKGROUND**

Briggs filed his Complaint for Due Process Violations, Violation of Title IX, Unlawful Discrimination, Defamation, and Other Claims Arising From UNM's Wrongful Termination of Plaintiff Based on False Allegations of Sexual Assault, filed July 2, 2020. (Doc. 1)("Complaint) against Defendants University of New Mexico ("UNM"), The Board of Regents of the University of New Mexico, Garnett Stokes, Paul B. Roth, Dorothy Anderson, Laura Vele Buchs, and Kevin Gick.  Briggs alleges that he UNM fired him "based solely on a false report of sexual assault." Complaint ¶ 1, at 1.

**I.     THE COURT WILL GRANT THE DUE PROCESS MTD.**

The Defendants move to dismiss the Complaint's Count I, which alleges that the Defendants violated Briggs' due process rights.  See Due Process MTD at 1; Complaint ¶¶ 112-135, at 19-22.  The Defendants contend that the Court should dismiss the claim pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Due Process MTD at 1.  At the hearing on August 24, 2021, the parties stipulated to dismiss Briggs' due process claims.  See Transcript of Hearing at 7:1-12 (taken August 24, 2021)("Tr.")("So for those reasons only plaintiff effectively stipulat[es] to the dismissal of his 1983 due process claims[.]")(Jackson).[2]  Because Briggs stipulates to dismissing the due process claims, and for the reasons stated on the record, the Court will grant the MTD Due Process, and dismiss Count I of the Complaint with prejudice.

---

[2]The Court's citations to the draft transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

## II.    THE COURT WILL GRANT IN PART AND DENY IN PART THE TITLE IX MTD.

Second, the Defendants move to dismiss the Complaint's Count II, which alleges that the Defendants discriminated against him on the basis of sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.  See Title IX MTD at 1; Complaint ¶¶ 136-168, at 22-26.  "Title IX does not authorize a cause of action against individuals; rather, it creates a right enforceable against educational institutions only." Schaefer v. Las Cruces Public Sch. Dist., 716 F. Supp. 2d 1052, 1068 (D.N.M. 2010)(Browning, J.)(citing Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257 (2009)("Title IX reaches institutions and programs that receive federal funds, 20 U.S.C. § 1681(a), which may include nonpublic institutions, § 1681(c), but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals.")). Because Title IX does not authorize a cause of action against individuals, the Court grants the Title IX MTD with respect to the individual defendants Stokes, Roth, Anderson, Buchs, and Gick with prejudice.

UNM and the UNM Board of Regents contend that the Court should dismiss the Title IX claim because Briggs does not plead sufficient factual allegations to advance his claim that "the process he was subjected to was inherently discriminatory against him" based on his sex.  Title IX MTD at 2.  Recently, the United States Court of Appeals for the Tenth Circuit decided Doe v. Univ. of Denver, 1 4th 822, 830 (10th Cir. 2021), which considers the plaintiff's burden on summary judgment to demonstrate that sex is a motivating factor in a university's disciplinary decision.  In Doe v. Univ. of Denver, Chief Judge Tymkovich notes: "[W]e recognize that evidence of an erroneous outcome or selective enforcement are means by which a plaintiff might show that sex was a motivating factor in a university's disciplinary decision."  1 F.4th at 830. The

- 4 -

Tenth Circuit also recognizes: "Generalized evidence, standing alone, cannot satisfy a Title IX plaintiff's summary judgment burden 'unless combined with a particularized something more . . . that would indicate that [the university]'s decision in his particular case was based on his gender.'" Doe v. Univ. of Denver, 1 F.4th at 831 (quoting Doe v. Univ. of Denver, 952 F.3d 1182, 1192-93 (10th Cir. 2020)("Doe I")).  While the Tenth Circuit acknowledges that the plaintiff needs to show particularized evidence of gender bias, it holds: "[The] University's investigation and treatment of [the plaintiff] raises a plausible inference that it discriminated against [the plaintiff] on the basis of his sex." Doe v. Univ. of Denver, 1 F.4th at 834.

> While a one-sided investigation, standing alone, might only raise a reasonable inference of anti-complainant bias, Doe I, 952 F.3d at 1203, where there is a one-sided investigation plus some evidence that sex may have played a role in a school's disciplinary decision, it should be up to a jury to determine whether the school's bias was based on a protected trait or merely a non-protected trait that breaks down across gender lines.

Doe v. Univ. of Denver, 1 F.4th at 834.

Both Doe I and Doe v. Univ. of Denver involve the burden a plaintiff faces on summary judgment. See Doe I, 952 F.3d at 1192-93; Doe v. Univ. Denver, 1 F.4th at 830.  Here, the Court need consider only whether Briggs has met his burden on a motion to dismiss: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(quoting Bell Atlantic Corp v. Twombly, 550 U.S. 544, 570 (2007)).  "[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).  Briggs alleges in his Complaint that: (i) the "Defendants purposely ignored exculpatory [evidence], conspired with the accuser to attempt to manufacture false evidence, and interpreted all evidence

to ensure a finding of sexual misconduct," Complaint ¶ 147, at 24; (ii) that the "Defendants failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation of the allegations against Plaintiff and when its subsequent adjudication was conducted in a manner biased against Plaintiff due to his sex," Complaint ¶ 151, at 24; and, (iii) that the "Defendants actively engaged in sex-based discrimination against the Plaintiff by terminating Plaintiff's employment without due process of law," Complaint ¶ 154, at 25.  Taking these allegations as true and in the light most favorable to Briggs, the Court concludes that Briggs has pled sufficient factual allegations to support his claim that UNM's investigation was discriminatory based on his gender. Consequently, the Court will deny the Title IX MTD with respect to UNM and UNM Board of Regents.

### III.    **THE COURT WILL GRANT THE NMTCA MTD.**

Third, the Defendants move to dismiss the Complaint's Counts IV-IX, which allege that the Defendants are liable to Briggs for: (i) Defamation (Count IV); (ii) Tortious Interference with Employment/Prospective Business (Count V); (iii) Breach of Implied Employment Contract (Count VI); (iv) Breach of Covenant of Good Faith and Fair Dealing (Count VII); (v) Negligent Hiring/Investigation (Count VIII); and (vi) Spoliation of Evidence (Count IX).  See NMTCA MTD, at 2; Complaint ¶¶ 177-199, at 27-29.  The NMTCA states that "[a] governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort" except as sovereign immunity is waived by provisions within the act.  N.M.S.A. § 41-4-4.  The NMTCA is the exclusive remedy for torts that governmental agencies or public employees allegedly commit.  See N.M.S.A. § 41-4-17.  No lawsuit can proceed against a New Mexico governmental entity or public employee without an explicit waiver under the NMTCA for the claims asserted. See May v. Bd. of Cty. Comm'rs of Dona Ana Cty., 426 F.Supp.3d 1013, 1019

(D.N.M. 2019)(Browning, J.).  In his Complaint, Briggs cites to two specific NMTCA waivers: the medical facility provision and the law enforcement officer provision.

First, Briggs alleges that UNM Health Sciences Center is a "'medial facility,' 'hospital,' and/or 'like facility,'" and thus, the falls under the NMTCA's waiver of tort immunity.  Complaint ¶ 13, at 5.   Immunity from suit is waived for "liability for damages resulting from . . . property damage caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital . . . or like facilities."  N.M.S.A. § 41-4-9.  The Court of Appeals of New Mexico has held that "Section 41-4-9 only applies to the extent that public employees operate a [medical facility], are negligent in such operation, and that negligence causes damages." Armijo v. Dep't of Health & Env't, 1989-NMCA-043, ¶ 11, 108 N.M. 616, 618, 775 P.2d 1333, 1335.  Thus, it is not enough for Briggs to plead that UNM qualifies as a medical facility because some of the allegations took place within the UNM Health Sciences Center.  See Armijo v. Dep't of Health & Env't, 1989-NMCA-043, ¶ 11, 108 N.M. at 618, 775 P.2d at 1335 (finding that the medical facility waiver does not apply where the defendant "did not regulate the actual clinical decision-making").  Briggs does not allege that the operation of the medical facility was the cause for his damages, and, thus, the medical facility waiver is inapplicable to Briggs' claims.

Second, Briggs alleges that UNM performed law enforcement functions, and thus, the law enforcement waiver applies.  See Complaint ¶ 22, at 8.  A law enforcement officer is a "full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor."  N.M. Stat. Ann. § 41-4-3.  New Mexico courts have construed this definition strictly. Chavez-Rodriguez v. City of Santa Fe, No. CIV 07–633, 2008 WL 5992269, at *4 (D.N.M. Oct. 17,

2009)(Browning, J.).  Because none of the Defendants have a principal duty to "hold in custody any person accused of a criminal offense," nor the power to "make arrests for crimes," the Court concludes that none of the Defendants are law enforcement officers.  The Court grants the NMTCA MTD with respect to Counts IV-IX and dismisses the claims accordingly.

## IV.     THE COURT WILL GRANT IN PART AND DENY IN PART THE NMHRA MTD.

Finally, the Defendants move to dismiss the Complaint's Count III, which alleges that the Defendants discriminated against Briggs in violation of Title VII of the Civil Rights Act of 1964 and the New Mexico Human Rights Act.[3]  See NMHRA MTD, at 1; Complaint ¶¶ 169-176, at 26-27.  At the hearing on August 24, 2021, both Briggs and the Defendants conceded that the Court should grant the NMHRA MTD with respect to Gick, because Briggs did not identify him as part of the NMHRA administrative complaint.  See Tr. at 63:11-14 (Hunteman).  The parties also agreed to deny the NMHRA MTD with respect to the remaining Defendants.  For the reasons stated on the record, the Court grants the NMHRA MTD with respect to Gick and denies the NMHRA MTD with respect to UNM, UNM Board of Regents, Stokes, Roth, Anderson, and Buchs.

**IT IS ORDERED** that: (i) Defendants' Motion to Dismiss Plaintiff's Claims for Due Process Violations (Count I), filed November 4, 2020 (Doc. 11), is granted; (ii) Defendants' Motion to Dismiss Plaintiff's Title IX Claim (Count II), filed November 4, 2020 (Doc. 12), is granted with respect to the individual defendants Garnett Stokes, Paul B. Roth, Dorothy Anderson, Laura Vele Buchs, and Kevin Gick, and denied with respect to Defendants University of New Mexico and University of New Mexico Board of Regents; (iii) Defendants' Motion to Dismiss

---

[3]42 U.S.C. § 2000e-1; N.M. Stat. Ann. § 28-1-1 ("NMHRA").

Plaintiff's Claims the Tort Claims Act (Counts I-IX), filed November 4, 2020 (Doc. 14), is granted;

and (iv) Defendants' Motion to Dismiss Plaintiff's Discrimination Claims Brought Under the New

Mexico Human Rights Act (Count III) for Lack of Personal Jurisdiction, filed November 4, 2020

(Doc. 16), is granted with respect to Defendant Kevin Gick, and denied with respect to Defendants

University of New Mexico, University of New Mexico Board of Regents, Garnett Stokes, Paul B.

Roth, Dorothy Anderson, and Laura Vele Buchs.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Meghan Dimond Stanford
Sarah K. Downey
Travis G. Jackson
Jackson Loman Stanford & Downey, P.C.
Albuquerque, NM

   *Attorneys for the Plaintiff*

John K. Ziegler
Kathy Black
Philip B. Hunteman
Conklin, Woodcock & Ziegler, P.C.

   *Attorneys for the Defendants*

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

MICHAEL BRIGGS,

      Plaintiff-Appellant,

v.

THE UNIVERSITY OF NEW MEXICO, a public university, THE BOARD
OF REGENTS OF THE UNIVERSITY OF NEW MEXICO, GARNETT
STOKES, individually and in her official capacity, PAUL B. ROTH,
individually and in his official capacity, DOROTHY ANDERSON,
individually and in her official capacity, LAURA VELE BUCHS,
individually and in her official capacity, and KEVIN GICK, individually and
in his official capacity,

      Defendants-Appellees.

---

On Appeal from the United States District Court
For the District of New Mexico
The Honorable Kea W. Riggs
District Court Case No. 20-cv-00651 KWR-JMR

---

**ATTACHMENT 3 TO APPELLANT'S OPENING BRIEF**
**District Court Judgment entered May 23, 2025 [Doc. No. 173]**

---

Travis G. Jackson
Jackson Loman Downey & Stevens-Block, P.C.
201 3rd St. NW, Suite 1500
Albuquerque, New Mexico 87102
Telephone (505) 767-0577
travis@jacksonlomanlaw.com

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MICHAEL BRIGGS,

     Plaintiff,

    vs.                                                               1:20-cv-00651 KWR/JMR

UNIVERSITY OF NEW MEXICO,
UNIVERSITY OF NEW MEXICO BOARD
OF REGENTS, GARNETT STOKES,
PAUL B. ROTH, DOROTHY ANDERSON,
LAURA VELE BUCHS, KEVIN GICK,

     Defendants.

## **JUDGMENT**

     Consistent with the orders and opinions entered in this case, the Court enters its Rule 58

judgment disposing of all claims in this case. The Court either enters summary judgment in favor

of Defendants or dismisses all claims in this case, as set forth in the orders and opinions.

     **IT IS SO ORDERED AND ADJUDGED.**[1]


_____/S/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE

---

[1] The parties agreed to dismiss the New Mexico Human Rights Act claim (Count III) against Defendant Gick for failure to exhaust. That claim is dismissed without prejudice.